# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ANTONIO ANGEL CASTILLO and JUAN
JOSE LEON LOZA,

       Petitioners,

vs.                                  No. CIV 25-1074 JB/JFR

MARY DE ANDRA YBARRA, DORA A.
CASTRO, KRISTI NOEM, PAMELA JO
BONDI, SIRCE OWEN, EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW,
OTERO IMMIGRATION COURT,

       Respondents.

## MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND OVERRULING IN PART THE OBJECTIONS TO THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on the Respondents' Objections to the Proposed

Findings and Recommended Disposition, filed December 5, 2025 (Doc. 11)("Objections"). The

Honorable John Robbenhaar, United States Magistrate Judge for the United States District Court

for the District of New Mexico, files the Magistrate Judge's Proposed Findings and Recommended

Disposition, on November 21, 2025 (Doc. 8)("PFRD"). The PFRD notifies the parties of their

ability to file Objections within fourteen days and that the failure to file Objections waives

appellate review. See PFRD at 27. On December 5, 2025, the Respondents -- Mary De Anda-

Ybarra, Kristi Noem, Pamela Bondi, Sirce Owen, the Executive Office for Immigration Review,

and the Otero Immigration Court, collectively "the Federal Respondents"[1] -- file their Objections

---

[1] Dora Castro, the Warden of the Otero County Processing Center does not work for the United States of America, and the attorneys working for the United States who file the Objections to the PFRD do not represent Castro. Castro indicates, however, that Castro adopts all of the Federal Respondents' positions and argument in these habeas cases.

to the PFRD.  See Objections at 1.  The primary issues that the Objections present are: (i) whether the United States properly detains the Petitioners under § 1225(b)(2), or instead the United States must detain the Petitioners under § 1226(a) and afford the Petitioners a bond hearing; (ii) whether the United States violates the Petitioners' due process rights because of their mandatory detention under § 1225(b)(2); (iii) whether, if the United States affords the Petitioners a bond hearing, the United States bears the burden of proving by clear-and-convincing evidence that Petitioners are a danger to the community or a flight risk; (iv) whether the PFRD recommends relief that the Petitioners do not seek in their TRO filings, by recommending injunctive relief requiring compliance with the applicable due process requirements;  (v) whether the Court should enjoin the Respondents from removing the Petitioners from the United States during the pendency of the habeas proceedings; and (vi) whether the PFRD characterizes Respondents' discretionary stay request correctly.  The Court concludes that: (i) the United States does not properly detain the Petitioners under § 1225(b)(2), but instead must detain the Petitioners under § 1226(a); (ii) the United States could violate Castillo's due process rights, depending on certain facts not currently before the Court, but does not violate Loza's due process rights because of the mandatory detention under § 1225(b)(2); (iii) the Court determines it is not appropriate here to reach the question of whether the United States bears the burden at a future bond hearing on a habeas petition; (iv) the PFRD does recommend relief that the Petitioners do not seek in their TRO filings, and the Court declines to afford relief not sought in the TRO; (v) the Court does not enjoin the Respondents from removing the Petitioners from the United States during the pendency of the habeas proceedings; and (vi) the Court concludes that the PFRD does not accurately reflect the Respondents' discretionary stay request.

## FACTUAL BACKGROUND

No party objects to the PFRD's factual background. Finding that the facts that Magistrate Judge Robbenhaar states, therefore, are not clearly erroneous, the Court therefore adopts the PFRD's facts. See Alexander v. Kirkpatrick, 435 F. Supp. 3d 1216, 1221-22 (D.N.M. 2020)(Browning, J.)("Because the parties have not objected to it, the Court does not review the PFRD de novo, but rather reviews [the PFRD] to determine if it is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.").

Loza is forty-nine years old and a Mexican citizen and national. See PFRD at 4. He first arrives in the United States around August, 1999, without inspection. See PFRD at 4. Loza resides in New Mexico, where he owns two restaurants -- one in Artesia, New Mexico and the other in Ruidoso, New Mexico -- that, in total, employs twenty-five people. See PFRD at 4. Loza has three children who are United States citizens, two of whom he financially supports while they attend college. See PFRD at 4. On August 16, 2025, Loza "was detained at a check point located in the interior of the United States," and the United States holds Loza since his detainment at the Otero County Processing Center in Chaparral, New Mexico. See PFRD at 4. The United States deems Loza to be an "applicant for admission" ineligible for a bond hearing under 8 U.S.C. § 1225(b)(2). See PFRD at 4.

Castillo is thirty-three years old and a Mexican citizen and national. See PFRD at 4. He first arrives in the United States as a minor in 2001, without inspection, and is raised in El Paso, Texas, until he is eighteen years old. See PFRD at 4. At an unspecified date, Castillo's abusive stepfather escorts Castillo to the international bridge between the United States and Mexico, and kicks Castillo out of the country. See PFRD at 5. Castillo reenters the United States on July 1, 2023. See PFRD at 5. On December 29, 2024, Castillo is encountered at the El Paso County Detention Facility following an arrest for Burglary of Habitation. See Motion to Dismiss Class Action Complaint and Petition for Writ of Habeas Corpus, at 3, filed December 23, 2025 (Doc.

21).  Shortly thereafter, on January 3, 2025, the United States detains Castillo.  See PFRD at 5.
Castillo's burglary charges are dismissed on March 2025.  See PFRD at 5.  Pursuant to Castillo's
request, an IJ holds a custody redetermination review on April 28, 2025.  See PFRD at 5.  The IJ
denies Castillo bond based on the ultimately incorrect basis that Castillo has been arrested for
domestic violence charges.  See PFRD at 5.  Castillo appeals this determination to the BIA on April
29, 2025.  See PFRD at 5.  On August 20, 2025, the BIA holds that the IJ's denial was clearly
erroneous, because Castillo has never been arrested for domestic violence, and remands the bond
matter to the IJ to continue exercising jurisdiction and issue a new order.  See PFRD at 5.  Pursuant
to the BIA order, Castillo has another bond hearing on August 28, 2025.  See PFRD at 5.  During
this hearing, DHS argues for the first time that the IJ does not have jurisdiction because Castillo is
deemed an applicant for admission and is not eligible for a bond.  See PFRD at 6.  The IJ finds
that it has jurisdiction, and further finds that Castillo proves, by clear-and-convincing evidence,
that he is neither a danger to society nor a flight risk.  See PFRD at 6.  Accordingly, the IJ orders
that Castillo be released on a $20,000.00 bond.  See PFRD at 6.  On August 29, 2025, however,
DHS files Form EOIR-43 (Notice of Intent to Appeal Custody Redetermination), which invokes
automatic-stay provisions under 8 C.F.R. § 1003.19(i)(2).  See PFRD at 6.  On September 10,
2025, DHS files Form EOIR-43 (Notice of Intent to Appeal Custody Redetermination),
supplementing the form with a brief arguing that the IJ lacks jurisdiction to hear bond requests or
to grant bond to any alien present in the United States without admission.  See PFRD at 6.  On
December 5, 2025, the BIA sustains DHS' appeal and vacates the IJ's  August 28, 2025 decision
granting release on bond under § 1226(a), deciding that the IJ lacked authority to hear Castillo's
request for a bond because Castillo is an applicant for admission subject to mandatory detention
under § 1225(b)(2).  See Matter of Antonio Adrian Castillo, No. Redacted, at 1, (B.I.A. Dec. 5,
2025)(unpublished), filed December 23, 2025 (Doc. 21).

## LAW REGARDING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer dispositive motions to a Magistrate Judge for a recommended disposition.  See Fed. R. Civ. P. 72(b)(1) ("A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense. . . .").  Rule 72(b)(2) governs objections: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2).  Finally, when resolving objections to a Magistrate Judge's proposal, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1).

"The filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute."  United States v. One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, and Contents, 73 F.3d 1057, 1059 (10th Cir.1996)("One Parcel")(quoting Thomas v. Arn, 474 U.S. 140, 147 (1985)).  As the United States Court of Appeals for the Tenth Circuit notes, "the filing of objections advances the interests that underlie the Magistrate's Act, including judicial efficiency."  One Parcel, 73 F.3d at

1059 (citing <u>Niehaus v. Kan. Bar Ass'n</u>, 793 F.2d 1159, 1165 (10th Cir.1986); <u>United States v. Walters</u>, 638 F.2d 947, 950 (6th Cir. 1981)).

The Tenth Circuit holds "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." <u>One Parcel</u>, 73 F.3d at 1060. "To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, have adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'" <u>One Parcel</u>, 73 F.3d at 1059. In addition to requiring specificity in objections, the Tenth Circuit states that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996). <u>See</u> <u>United States v. Garfinkle</u>, 261 F.3d 1030, 1031 (10th Cir. 2001)("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived."). In an unpublished opinion, the Tenth Circuit states that "the district court correctly held that [a petitioner] had waived [an] argument by failing to raise it before the magistrate." <u>Pevehouse v. Scibana</u>, 229 Fed. Appx. 795, 796 (10th Cir.2007).[2]

---

[2]<u>Pevehouse v. Scibana</u> is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing <u>In re Citation of Unpublished Opinions/Orders & Judgments</u>, 151 F.R.D. 470 (10th Cir. 1993)). The Court concludes that

In <u>One Parcel</u>, the Tenth Circuit, in accord with other Courts of Appeals, expands the

waiver rule to cover objections that are timely but too general.  See One Parcel, 73 F.3d at 1060.

The Supreme Court of the United States -- in the course of approving the United States Court of

Appeals for the Sixth Circuit's use of the waiver rule -- notes:

> It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings. The House and Senate Reports accompanying the 1976 amendments do not expressly consider what sort of review the district court should perform when no party objects to the magistrate's report. *See* S.Rep. No. 94-625, pp. 9-10 (1976)(hereafter Senate Report); H.R.Rep. No. 94-1609, p. 11 (1976), U.S.Code Cong. & Admin. News 1976, p. 6162 (hereafter House Report).  There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate. Moreover, the Subcommittee that drafted and held hearings on the 1976 amendments had before it the guidelines of the Administrative Office of the United States Courts concerning the efficient use of magistrates. Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or *ruling* on a motion or an issue, his determination should become that of the district court, unless specific objection is filed within a reasonable time." *See* Jurisdiction of United States Magistrates, Hearings on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)(hereafter Senate Hearings). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. *See id.,* at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order."). The Judicial Conference of the United States, which supported the *de novo* standard of review eventually incorporated in § 636(b)(1)(C), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. *See* Senate Hearings, at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative

---

<u>Pevehouse v. Scibana</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of the matters now before it.

history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

Thomas v. Arn, 474 U.S. at 150-52 (emphasis in original).

The Tenth Circuit also notes, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'" One Parcel, 73 F.3d at 1060 (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir.1991)("We join those circuits that have declined to apply the waiver rule to a pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations."). Cf. Thomas v. Arn, 474 U.S. at 154 (noting that, while "[a]ny party that desires plenary consideration by the Article III judge of any issue need only ask," a failure to object "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard"). In One Parcel, the Tenth Circuit notes that the district judge decides sua sponte to conduct a de novo review despite the objections' lack of specificity, but the Tenth Circuit deems the issues waived on appeal, because waiver advances the interests underlying the waiver rule. See 73 F.3d at 1060-61 (citing cases from other Courts of Appeals where district courts elect to address merits despite potential application of waiver rule, but Courts of Appeals opt to enforce waiver rule).

Where a party files timely and specific objections to the Magistrate Judge's PFRD, on "dispositive motions, the statute calls for a de novo determination, not a de novo hearing." United States v. Raddatz, 447 U.S. 667, 674 (1980). "[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate judge's proposed findings and recommendations." United States v. Raddatz, 447 U.S. at 676, (quoting 28 U.S.C. § 636(b) and citing Mathews v. Weber, 423 U.S. 261, 275 (1976)). The Tenth Circuit requires a "district court

to consider relevant evidence of record and not merely review the magistrate judge's recommendation" when conducting a de novo review of a party's timely, specific objections to the magistrate judge's report.  In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995).  "When objections are made to the magistrate's factual findings based on conflicting testimony or evidence . . . the district court must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing."  Gee v. Estes, 829 F.2d 1005, 1008-09 (10th Cir. 1987).

A district court must "clearly indicate that it is conducting a de novo determination" when a party objects to the Magistrate Judge's report "based upon conflicting evidence or testimony." Gee v. Estes, 829 F.2d at 1009.  On the other hand, a district court fails to meet the requirements of 28 U.S.C. § 636(b)(1) when it indicates that it gave "considerable  deference to the magistrate's order." Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1464 (10th Cir. 1988).  A district court need not, however, "make any specific findings; the district court must merely conduct a *de novo* review of the record."  Garcia v. City of Albuquerque, 232 F.3d 760, 766 (10th Cir.2000).  "[T]he district court is presumed to know that de novo review is required.  Consequently, a brief order expressly stating the court conducted de novo review is sufficient."  Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996)(citing In re Griego, 64 F.3d at 583-84).  "[E]xpress references to de novo review in its order must be taken to mean it properly considered the pertinent portions of the record, absent some clear indication otherwise."  Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722, 724 (10th Cir. 1993).  The Tenth Circuit holds that a district court properly conducts a de novo review of a party's evidentiary objections when the district court's "terse" order contains one sentence for each of the party's "substantive claims" and does "not mention his procedural challenges to the jurisdiction of the magistrate to hear the motion."  Garcia v. City of Albuquerque, 232 F.3d at 766.  The Tenth Circuit explains that brief district court orders that "merely repeat[ ]

the language of § 636(b)(1) to indicate its compliance" are sufficient to demonstrate that the district

court conducts a de novo review:

> It is common practice among district judges in this circuit to make such a statement and adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis. We cannot interpret the district court's statement as establishing that it failed to perform the required de novo review.

In re Griego, 64 F.3d at 584.

Notably, because "Congress intended to permit whatever reliance a district judge, in the

exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and

recommendations," United States v. Raddatz, 447 U.S. at 676 (emphasis omitted), a district court

"may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate," 28 U.S.C. § 636(b)(1). See Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d

at 724-25 (holding that the district court's adoption of the Magistrate Judge's "particular

reasonable-hour estimates" is consistent with the de novo determination that 28 U.S.C. § 636(b)(1)

and United States v. Raddatz require).

Where no party objects to the Magistrate Judge's PFRD, the Court reviews, as a matter of

course and in the interests of justice, the Magistrate Judge's recommendations.  In Pablo v. Soc.

Sec. Admin., No. CIV 11-0132 JB/ACT, 2013 WL 1010401 (D.N.M. February 27,

2013)(Browning, J.), the plaintiff fails to respond to the Magistrate Judge's PFRD, and thus waives

his right to appeal the recommendations, but the Court nevertheless conducts a review.  See 2013

WL 1010401, at *1, *4.  The Court generally does not, however, "review the PFRD de novo,

because the parties have not objected thereto, but rather review[s] the recommendations to

determine whether they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of

discretion." Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *4.  The Court, thus, does not

determine independently what it would do if the issues had come before the Court first, when there

is no objection, but rather adopts the PFRD where "'the Court cannot say that the Magistrate Judge's recommendation . . . is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.'" Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *3 (quoting Workheiser v. City of Clovis, No. CIV 12–0485 JB/GBW, 2012 WL 6846401, at *3 (D.N.M. December 28, 2012)(Browning, J.). See Alexandre v. Astrue, No. CIV 11-0384 JB/SMV, 2013 WL 1010439, at *4 (D.N.M. February 27, 2013)(Browning, J.)("The Court rather reviewed the findings and recommendations . . . to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion. The Court determines that they are not, and will therefore adopt the PFRD."); Trujillo v. Soc. Sec. Admin., No. CIV 12-1125 JB/KBM, 2013 WL 1009050, at *5 (D.N.M. February 28, 2013)(Browning, J.)(adopting the proposed findings and conclusions, and noting: "The Court did not review the ARD de novo, because Trujillo has not objected to it, but rather reviewed the . . . findings and recommendation to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion, which they are not."). This review, which is deferential to the Magistrate Judge's work when there is no objection, nonetheless provides some review in the interest of justice, and seems more consistent with the waiver rule's intent than no review at all or a full-fledged review. Accordingly, the Court considers this standard of review appropriate. See Thomas v. Arn, 474 U.S. at 151 ("There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate."). The Court is reluctant to have no review at all if its name is going at the bottom of the order adopting the Magistrate Judge's PFRD.

## LAW REGARDING 8 U.S.C. § 1225

Before jumping to § 1225(b)(2), it is important to zoom to 30,000 feet or more, and look at the United States and § 1225 as a whole. The United States is the third-largest country in terms of land mass, and it has an approximately 5,525-mile border with Canada, see U.S. Department of

Homeland Security, <u>Considerations for United States -- Canada Border Traffic Disruption Management</u>, at 2 (2012), and 1,954-mile border with Mexico, U.S. Customs and Border Protection, <u>Smart Wall Map</u>, https://www.cbp.gov/border-security/along-us-borders/smart-wall-map (last visited Jan. 1, 2026). Other entry points are Puerto Rico, the United States Virgin Islands, Guam, and other island territories. <u>See</u> U.S. Department of the Interior, <u>Insular Areas of the United States and Freely Associated States</u> (last visited Jan. 1, 2026), https://www.doi.gov/library/internet/insular.[3] In addition, aliens may seek entry into the United States in many ways, including stowing away in vehicles, and at many places, like the waters of the Rio Grande or the Arizona deserts. <u>See</u> Fact Sheet, <u>Modes of Entry for the Unauthorized migrant Population</u>, Pew Research Center (May 22, 2006), https://www.pewresearch.org/race-and-ethnicity/2006/05/22/modes-of-entry-for-the-unauthorized-migrant-population/.

Each day the United States Customs and Border Protection ("CBP") must process over a million individuals. U.S. Customs and Border Protection, <u>On a Typical Day in Fiscal Year 2024, CVP . . .</u>, ("2024 CBP Statistics"), https://www.cbp.gov/newsroom/stats/typical-day-fy2024 (last visited Jan. 8, 2025)(stating that CBP processes "1,150,387 passengers and pedestrians" on a typical day).[4] That figure encompasses "4,267 nationwide enforcement encounters between ports

---

[3] Other notable United States territories include the American Samoa and the Commonwealth of the Norther Mariana Islands. <u>See</u> U.S. Department of the Interior, <u>Insular Areas of the United States and Freely Associated States</u>://www.doi.gov/library/internet/insular (last visited Jan. 1, 2026), https.

[4] The CBP does not just process individuals. On a typical day, CBP processes "3.8 million de minimis shipments"; "88,582 truck, rail, and sea containers"; and "270,800 incoming privately owned vehicle." 2024 CBP Statistics. De minimis shipments are articles free of duty and of any tax imposed on or by reason of importation, because the retail value in the country of shipment does not exceed $800.00. <u>See</u> U.S. Custom and Boarder Protection, <u>Section 321 Programs</u>, the <u>Trade Facilitation and Trade Enforcement Act</u>, Trade, https://www.cbp.gov/trade/trade-enforcement/tftea/section-321-programs (last visited Jan. 28, 2026)(citing 19 U.S.C. § 1321).

of entry" each day and "3,682 nationwide enforcement encounters at ports of entry" each day. 2024 CBP Statistics.[5]  Extrapolating these numbers mean that, in 2024, CBP encounters over 400 million passengers and pedestrians, and, of those, there are almost three million enforcement "encounters," or 0.69% of the arriving people, where the individual is not a citizen or does not have a lawful reason for entering the country.

In contrast to the CBP, which conducts screening at a scale involving hundreds of millions of arriving individuals, the Enforcement and Removal Operations ("ERO"), within the United States Immigration and Customs Enforcement ("ICE"), operates in an enforcement environment with lower volume.[6]  In 2024, ICE makes approximately 179,282 arrests, of which the ERO makes "113,431" administrative arrests, including "33,243" "at-large" arrests.  2024 ICE Report at 2-3.[7] The difference in volume drives the practical reality between inspections and removal determinations.  The scale and immediacy of inspection and admission determinations justify rapid, on-the-spot judgments that may be based on incomplete information.  Mandatory removal

---

[5] "Enforcement encounters" include U.S. Border Patrol ("USBP") Title 8 Apprehensions, Office of Field Operations ("OFO") Title 8 Inadmissibles, and Title 42 Expulsions, and this pharse does not include citizens and individuals CBP admit through other lawful means.  See CBP, Nationwide Encounters Fiscal Year 2025, https://www.cbp.gov/newsroom/stats/nationwide-encounters-fy2025 (last visited Jan. 9, 2025).

[6] The Homeland Security Act of 2002 "created ICE by merging the investigative and interior enforcement elements of the former U.S. Customs Service and the Immigration and Naturalization Service."  ICE, Annual Report Fiscal Year 2024, at 8 (2024)("2024 ICE Report"). Within ICE, the ERO's mission is to protect "the homeland by arresting and removing noncitizens who undermine the safety of U.S. communities and the integrity of U.S. immigration laws . . . . [A]nd its primary areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and removal efforts."  2024 ICE Report at 9.  \

[7] Administrative arrests occur when the ERO arrests an alien for a violation of the INA with or without a criminal history.  See 2024 ICE Report at 15. At-large arrests, which are a subset of administrative arrests, occur when the ERO arrests an alien "within the community."  2024 ICE Report at 15.  In contrast to at-large arrests, "custodial arrests" occur when law enforcement transfers custody of an alien in jail or prison to the ERO.  2024 ICE Report at 15.

and deportation decisions, by contrast, carry greater consequence, and therefore lack the same justification for summary determinations.

Courts often are quick to criticize Congress -- the most important political branch in our democratic government -- for the way it writes laws. Given the magnitude of writing a statute that governs the inspection of every citizen and alien's entry into the United States, the Court approaches the task of interpreting Congress' work with an appreciation for the task's extraordinary complexity. Congress does not write §§ 1225 and 1226 against a small or static backdrop. They reflect Congress' effort to regulate admission decisions across vast borders, innumerable entry points, and an enormous volume of daily inspections.

1.    <u>History of 8 U.S.C. § 1225.</u>

In 1996, Congress passes the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 ("IIRIRA"), which amends the Immigration and Nationality Act, 66 Stat. 166 ("INA"). <u>Reno</u>, 525 U.S. at 473. The legislative history indicates that, in enacting IIRIRA, Congress seeks to "strengthen and tighten" immigration laws, addressing two interrelated concerns. <u>Arevalo v. Ashcroft</u>, 344 F.3d 1, 4 (1st Cir. 2003). First, Congress identifies a structural inequity in the pre-1996 regime where aliens who avoid ports of entry and enter the United States unlawfully receive more extensive procedural protections in deportation proceedings than those who present themselves for inspection through lawful channels. <u>See</u> <u>Hing Sum v. Holder</u>, 602 F.3d 1092, 1100 (9th Cir. 2010)("<u>Hing Sum</u>")(discussing that the IIRIRA eliminates the "'entry doctrine'" where aliens who enter the United States "without inspection could take advantage of the greater procedural and substantive rights affording in deportation proceedings, while aliens who presented themselves at a port of entry for inspection are subject to more summary exclusion proceeding"). Second, Congress confronts a problem of administrative scale. <u>See</u> <u>Am. Immigr. Laws. Ass'n v. Reno</u>, 199 F.3d 1352, 1354 (D.C. Cir. 2000)("<u>Am. Immigr. Laws. Ass'n</u>"). By

1996, immigration officers are conducting inspections in the tens of millions annually, yet existing law permits broad opportunities to contest admissibility determinations through hearings, producing delay and strain on limited adjudicatory resources.  See Am. Immigr. Laws. Ass'n, 199 F.3d at 1354-55.[8]  Congress enacts the IIRIRA to correct both the inequity in procedural treatment and the practical burden that the inspection system imposes by amending the INA to eliminate its definition of "entry" and by adding to § 1225 expedited removal proceedings.

### a.    Applicants for Admission.

The IIRIRA eliminates a distinction between aliens who are applicants for admission and aliens present in the United States.  See Succar v. Ashcroft, 394 F.3d 8, 12 (1st Cir. 2005)("Succar")(stating that aliens are either "(a) applicants for admission and (b) non-citizens present in the United States who had previously made an entry into the country either with, or without, an inspection").  For admission and removal, lawful admission -- not entry -- is now the

---

[8] The INA defines an immigration officer as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title."  8 U.S.C. §1101(a)(18).  The Code of Federal Regulations defines an "immigration officer" as:

[E]mployees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 C.F.R. § 2.1.

8 C.F.R. § 1.2

defining concept.    See 1 Ira J. Kurzban, Immigration Law Sourcebook 73 (18th ed. 2022)("Kurzban").  Entry is less important with Congress' enactment of the IIRIRA, in which Congress strikes the definition for "entry" from the INA and replaces entry with a definition of who is an applicant for admission.  Kurzban, supra, at 73.  By eliminating the definition of "entry," and replacing "entry" with the terms "admission" and "admitted," Congress "re-characterize[s] aliens who are present in the United States, but who have not been inspected and admitted" as "applicants for admission."  Succar, 394 F.3d at 13.  Congress defines admission as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).

The re-characterization is important, because, before the IIRIRA, only "applicants for admission" are subject to "exclusion proceedings," but aliens present in the country without an inspection are subject to "deportation proceedings."  Succar, 394 F.3d at 12-13.  See Landon v. Plasencia, 459 U.S. 21, 25 (1982)("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission.").  Aliens subject to deportation proceedings are given more procedural protections than those subject to exclusion proceedings.  See, e.g., Landon v. Plasencia, 459 U.S. 21, 25-26 (1982)(discussing the differences in the two proceedings, including the right of appeal for deportation proceedings but not in exclusion proceeding).  Specifically, deportable aliens are "entitled [to] a hearing before a special inquiry officer in which the individual had the right to be represented, to examine the government's evidence, and to present evidence on his or her behalf."  Make The Rd. New York v. Wolf, 962 F.3d 612, 618 (D.C. Cir. 2020)("Make the Road").  The distinction that immigration law historically draws between "deportation proceedings," which concern the removal of aliens already within the United States, and "exclusion proceedings," which concern the prevention of

entry, reflect the long-recognized principle that "the Due Process Clause applies to all 'persons' within the United States, including aliens, regardless of whether their presence is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001)("Zadvydas")(quoting U.S. Const. amend. XIV, § 1, and citing Plyler v. Doe, 457 U.S. 202, 210 (1982)); Mathews v. Diaz, 426 U.S. 67, 77 (1976); Kwong Hai Chew v. Colding, 344 U.S. 590, 596-598, and n.5 (1953); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886)). With IIRIRA's enactment, Congress eliminates the dual system of deportation and exclusion proceedings, and replaces the dual system with the universal "removal proceedings," under which immigration officers process all aliens who are applicants for admission. Succar, 394 F.3d at 13.

Within the removal proceedings' current umbrella, Congress designates certain aliens as subject to "expedited" removal and other aliens subject to removal under § 1229a, "the usual removal process." Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 108-09 (2020)("Thuraissigiam"). Similar to the previous "deportation proceedings," "[t]he usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed." Thuraissigiam, 591 U.S. at 108. Under IIRIRA's expedited removal provision, immigration officers "shall order the alien removed" if the immigration officer determines that the alien is inadmissible, "because she does not have a valid entry document or other suitable travel document, or because she has obtained a visa through misrepresentation." Make the Road, 962 F.3d at 619 (citing 8 U.S.C. § 1225(b)(1)(A)(i)). Under the expedited removal processes, there is no hearing and no opportunity for the alien to present evidence. See Make the Road, 962 F.3d at 619 (stating that, after the immigration officers' determination, "all that stands between that individual and removal is a paper review by the officer's supervisor"). Aliens applying for asylum or claim a fear of prosecution are an exception to expedited removal proceedings. See Thuraissigiam, 591 U.S. at 109 ("If an applicant 'indicates

either an intention to apply for asylum' or 'a fear of persecution,' the immigration officer 'shall

refer the alien for an interview by an asylum officer.'")(quoting 8 U.S.C. §§ 1225(b)(1)(A)(i)-(ii)).

Based on the asylum officer's determination, an arriving alien either receives "'full consideration

of his asylum claim in a standard removal hearing," Thuraissigiam, 591 U.S. at 110 (quoting 8

C.F.R. § 208.30(f)); see 8 U.S.C. § 1225(b)(1)(B)(ii)); or the expedited removal proceedings of 8

U.S.C. § 1225(b)(1)), see Thuraissigiam, 591 U.S. at 110 (stating that "all that an alien must show

to avoid expedited removal is a 'credible fear'")(quoting 8 U.S.C. § 1158(b)(1)(A)).

### b.    Expedited Removal

Thus, with IIRIRA's passage, Congress closes the procedural anomaly of the "entry

doctrine," Hing Sum, 602 F.3d at1100, and gives immigration officers the tools to process the

"million[s of] primary inspections" occurring at the border, Am. Immigr. Laws. Ass'n, 199 F.3d at

1355. Congress passes the IIRIRA with the expedited removal provisions to address the practical

reality that large volumes of "arriving" aliens are overwhelming the usual removal processes. Am.

Immigr. Laws. Ass'n, 199 F.3d at 1355. Congress therefore empowers immigration officers to

resolve straightforward inadmissibility determinations quickly where the alien "indisputably" has

no authorization to be admitted into the United States. H.R. Conf. Rep. No.. 104–828, at 209

(1996)("House Report")(stating that the "purpose of the provisions [paragraph (b)(1)] is to

expedite the removal from the United States of aliens who indisputably have no authorization to

be admitted to the United States . . . .").

Furthermore, "[n]ew paragraph (b)(2) provides that an alien determined to be inadmissible

by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an

alien crewman or stowaway) shall be referred for a hearing before an immigration judge under

new section 240." House Report at 209. The language "other than an alien subject to removal

under paragraph (b)(1)" in § 1225(b)(2)(A) is significant. House Report at 209. Section

1225(b)(1) authorizes immigration officers to conduct expedited removal for specified categories of arriving aliens whom the officer determines to be inadmissible for reasons including fraud or misrepresentation, see 8 U.S.C. § 1182(a)(6)(C), or a lack of valid entry documents, see 8 U.S.C. § 1182(a)(7). Where the immigration officer makes such a determination, the immigration officer may order removal without further hearing or review, and impose the attendant statutory consequences, including a bar on reentry. See 8 U.S.C. § 1182(a)(9)(A)(i) (stating that any "alien who has been ordered removed under section 1225(b)(1) of this title . . . who again seeks admission within 5 years of the date of such removal . . . is inadmissible").

2.    **Structure of 8 U.S.C. § 1225.**

In interpreting a Congressional statute, the plain language that Congress writes is the most important, but the statute's structure can help the Court interpret the statute's words. Congress titles § 1225: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." 8 U. S. C. § 1225.[9] Thus, from the title, the reader can surmise that

---

[9] The United States Code contains titles Congress codifies as "positive law," which Congress enacts as a whole, and titles Congress does not codify, which the Office of the Law Revision Counsel of the House of Representatives of the United States compiles from various congressional enactments. See United States v. DeLeon, 406 F. Supp. 3d 1129, 1170 n.17 (D.N.M. 2019)(Browning, J.)("DeLeon")(citing 1 U.S.C. § 204(a); 2 U.S.C. §§ 285, 285b). The term positive law has both a general meaning and a specialized meaning in the context of the United States Code. See Office of the Law Revision Counsel United States Code, The Term "Positive Law," in Positive Law Codification, ("Positive Law") https://uscode.house.gov/codification /term_positive_law.htm (last visited Jan. 28, 2026). In the United States Code context positive law refers specifically to Code titles that Congress enacts as complete statutory titles through the of a codification bill that repeals prior enactments and restates them in organized form. See Positive Law. Titles Congress enacts piece by piece are non-positive-law titles, which are editorial compilations of statutes assembled by the Office of the Law Revision Counsel. See Positive Law. Although Congress does not enact non-positive-law titles themselves, Congress does enact the underlying statutes they contain. See Positive Law. Thus, all provisions in the U.S. Code are positive law in the general sense, but only some titles are positive law in the technical codification sense. Titles Congress codifies are authoritative expositions of the law whereas uncodified titles are prima facie evidence of the law. See DeLeon, 406 F. Supp. 3d at 1170 n.7 (citing 1 U.S.C. § 204(a)).

they are about: (i) inspection; (ii) expedited removal of arriving aliens; and (iii) referral for hearings.  The Court should be slow to read a lot more into § 1225 that what the title details.

Section 1225 has four subparts: (i) "Inspection," 8 U.S.C. § 1225(a); (ii) "Inspection of applicants for admission," 8 U.S.C. § 1225(b); (iii) "Removal of aliens inadmissible on security and related grounds," 8 U.S.C. § 1225(c); and (iv) "Authority related to inspections," 8 U.S.C. § 1225(d).  The Court views § 1225's organization as reflecting a statutory design to address immigration officer's inspections, the expedited removal process, and the process of removing an alien after a hearing.  Each subpart addresses a discrete component of the inspection process, moving from examination to summary removal determinations and then to the ancillary powers necessary to carry out those functions.

    a.    **8 U.S.C. § 1225(a): Inspection.**

As the title of § 1225 promises, Congress labels the first section "Inspection."  8 U.S.C. § 1225(a).  The Court does not quickly move past the word "Inspection."  8 U.S.C. § 1225(a).  "Inspection" denotes the "act of inspection," or "a checking or testing of an individual against established standards," Inspection, Merriam-Webster.com Dictionary, Merriam-Webster,

---

Congress codifies § 1225's heading -- including subheadings -- in September, 1996.  See Omnibus Consolidated Appropriations Act of 1997, PL 104-208, September 30, 1996, 110 Stat 3009.  Congress, thus, enacts 8 U.S.C. § 1225's heading, which is a permissible guide when construing ambiguous statutory text.  See Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)("[W]e have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text."); Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989)(resolving ambiguity of 29 U.S.C.§ 1344 by looking at its title); Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29 (1947)("[H]eadings and titles are not meant to take the place of the detailed provisions of the text. . . .  For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt."); S. Furniture Leasing, Inc. v. YRC, Inc., 989 F.3d 1141, 1150 (10th Cir. 2021)("To be sure, 'the title of a statute or section can aid in resolving an ambiguity in the legislation's text.'")(quoting Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. at 189).

https://www.merriam-webster.com/dictionary/inspection. (last visited on Jan. 17, 2026), and to "inspect" means "to view closely in critical appraisal: look over" or "to examine officially," Inspecting, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspecting. (last visited on Jan. 17, 2026). Inspection's ordinary meaning implies an individualized encounter between an immigration officer and a single alien -- often an officer face-to-face with an alien for evaluation purposes. The word "inspection" is difficult to reconcile with mass or abstract enforcement. In addition to focusing on the words that the statute uses, it is also important to note what words § 1225 does not use. Section 1225 does not speak in terms of "arrest" or "apprehension." Those concepts are present in the INA, but their absence from § 1225's title and text indicates that Congress places those powers elsewhere, and § 1225 is in a distinct procedural posture -- often face-to-face inspection and examination at the threshold of entry.

Section 1225(a) gives the definition for five inspection terms that the statute uses. Section 1225(a)(1)'s opening clause is foundational to the statute's operation, and Congress emphasizes its breadth through deliberate phrasing. Section 1225(a)(1) defines aliens who are "treated as applicant[s] for admission." 8 U.S.C. § 1225(a)(1). For purposes of this chapter, immigration officers treat aliens as applicants for admission if they are:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1). Notably, an alien is an "applicant for admission" if the alien is "present in the United States" and is "not admitted." 8 U.S.C. § 1225(a)(1). The definition also covers aliens "who arrive[] in the United States" regardless whether they arrive at a designated port of entry. 8 U.S.C. § 1225(a)(1). With this scope, Congress indicates that § 1225 treats almost all aliens are

as "applicants for admission."  It is hard to image how Congress could have written § 1225(a)(1) more broadly.

In § 1225(a)(1), the United States is passive.  The United States does not have to do anything -- such as effecting a stop -- to impose the status of "applicant for admission" upon an alien.  8 U.S.C. § 1225(a)(1).  An alien "present" in the United States who has not been admitted or who arrives in the United States is, by law, an applicant for admission.  At the same time, § 1225(a) indicates that the aliens whom the United States treats as "applicants for admission" has subgroups.  8 U.S.C. § 1225(a)(2).  For stowaways, who are aliens "present in the United States who [have] not been admitted" or who are aliens "who arrive[] in the United States," and thus an applicant for admission, the statutes quickly states they are "not eligible to apply for admission or to be admitted."  8 U.S.C. § 1225(a)(2) (brackets added).  Moreover, § 1225(a)(2) states "[i]n no case may a stowaway be considered an applicant for admission or [be considered] eligible for a hearing under section 1229a."  8 U.S.C. § 1225(a)(2).  Section 1225(a)(3), titled "Inspection," states all "aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  The statute use's of "or otherwise seeking admission" suggests that aliens who are treated as applicant for admission are not coterminous with aliens who are "seeking admission."  8 U.S.C. § 1225(a)(3).  Thus, § 1225(a) suggest that not all applicants for admission can apply for admission or are seeking admission.  The Court notes that § 1225(a) continues by defining "Withdrawal of application for admission" and "Statements."  8 U.S.C. §§ 1225(a)(4)-(5).[10]  Although § 1225 does not define "admission" or "admitted," § 1101(a)(13)(A)

_____

[10] Section 1225 defines the withdrawal of application for admission by stating an "alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).

defines those terms as, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).

Section 1225(a) frames § 1225's scope by situating the section within an inspection-based posture.  Congress specifies which aliens are subject to inspection -- those seeking admission or readmission -- and identifies those who are not, including stowaways.  The provision further contemplates that an applicant for admission may withdraw the application and "depart immediately" from the United States, underscoring the section's focus on entry-stage judgments. 8 U.S.C. § 1225(a)(4).  By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures that follow.  Section 1225(a) thus presupposes an alien whom the United States has not admitted, but is applying for admission, free to abandon the inspection process and depart without restraint.

**b.      8 U.S.C. § 1225(b): Inspection of Applicants for Admission.**

Congress titles § 1225(b): "Inspection of applicants for admission."  8 U.S.C. § 1225(b). [11]  In providing the process for inspecting "applicants for admission," Congress begins with subparagraph (b)(1), which governs the inspection of "aliens arriving in the United States and certain other aliens who have not been admitted or paroled."  8 U.S.C. § 1225(b)(1).  Section 1225(b)(1) is the process for the "expedited" removal that Congress mentions in the title, even though the word "expedited" appears nowhere in subparagraph (b)(1).  Congress allows § 1225(b)(1) to apply to "certain other aliens," and subparagraph § 1225(b)(2) governs the inspection of "other aliens."  8 U.S.C. § 1225(b)(2).  As the Court discusses below, all aliens are run through

---

[11] Federal law makes entering the United States without inspection a misdemeanor.  See 8 U.S.C. § 1325.  See United States v. Vencomo-Reyes, No. CR 11-2563 JB, 2011 WL 6013546, *10 n.8 (D.N.M. Nov. 28, 2011)(Browning, J.)(stating that under "federal immigration law, it is not a felony to be in the United States illegally.  Although it is a misdemeanor the first time an individual enters the Unted States without inspection" (citing 8 U.S.C. § 1325(a))).

§ 1225 (b)(1) first, and if an alien is an "arriving alien" or a "certain other alien" in § 1225(b)(1)(A)(iii), the alien never becomes an "other alien" in § 1225(b)(2).  8 U.S.C. § 1225(b)(2)(ii) ("Subsection (A) shall not apply to an alien -- (ii) to whom paragraph (1) applies . . . ."). Section 1225(b)'s remaining provisions establish enforcement and review mechanisms, including authorization for State attorneys general to bring civil actions for harms arising from detention or removal under subparagraphs (b)(1) and (b)(2), see 8 U.S.C. § 1225(b)(3), as well as procedures for challenging determinations that immigration officers make, see 8 U.S.C. § 1225(b)(4). The heart of this dispute, in part, concerns the relationship between § 1225(b)(1) and § 1225(b)(2), and, given its significance, the Court describes these provisions in greater detail.

Section 1225(b)(1)'s title, "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," indicates Congress intends that immigration officers apply the following provision to two groups of aliens. 8 U.S.C. § 1225(b)(1). The two groups of aliens are "aliens arriving in the United States"[12] and "certain other aliens." 8 U.S.C. § 1225(b)(1). Congress, after defining the class of applicants for admission subject to § 1225(b)(1), establishes a framework for the "screening" of arriving aliens, including procedures for asylum interviews and limitations on judicial review. 8 U.S.C. §§ 1225(b)(1)(A)-(C). Again, language is important.

i.    **Screening of Arriving Aliens.**

---

[12] The Department of Homeland Security defines an "arriving alien" as:

Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2.

Congress says "screening" -- not arrest, not apprehension, and not custody.  8 U.S.C. § 1225(b)(1)(A).  Merriam-Webster defines "screen" to mean "to examine methodically in order to separate into different groups," "to select or eliminate by a screening process," or "to test or examine for the presence of something," reinforcing that § 1225(b)(1)'s use primarily is at a port of entry, at the border, or at an immigration office where an immigration officer must methodically separate inadmissible aliens from individuals whom Congress permits lawful entry.  Screen, Merriam-Webster.com      Dictionary,      Merriam-Webster,      https://www.merriam-webster.com/dictionary/screen. (last visited on Jan. 18, 2026).  See Jennings, 583 U.S. at 285 ("Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official 'port of entry' . . . or who have been apprehended trying to enter the country at an unauthorized location.").  The process is about screening -- inspection driven -- and not about the arrest or apprehension of aliens.  Furthermore, screening suggests that immigration officers often begins the screening and inspection process in the presence of the alien, after the alien presents to the immigration officer to verify entry documents.

### ii.  "Arriving Aliens" are the Default Group.

As the Court observes above, § 1225(b)(1) applies to two groups of aliens, and § 1225(b)(1)(A) further divides the groups into subgroups.  See 8 U.S.C. § 1225(b)(1)(A).  Section 1225(b)(1)(A)(i) states: "If an immigration officer determines that an alien . . . who is arriving in the United States or [] [certain other aliens] in clause (iii) is inadmissible under 1182(a)(6)(C) or 1182(a)(7) of this title . . . the officer shall order the alien removed from the United States without further hearing or review . . . ."  8 U.S.C. § 1225(b)(1)(A)(i).  Certain other aliens include:

> An alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1)(A)(iii)(II).  Taken together, these provisions identify the universe of aliens subject to expedited removal following inspection, characterized by removal "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).

Section 1225(b)(1)(A)(i) is the general rule, applying to aliens "arriving in the United States," but also to "certain other aliens" that Congress describes in "clause (iii)."  8 U.S.C. § 1225(b)(1)(A)(i).  Although Congress applies expedited removal to all aliens arriving or to whom clause (iii) is applicable, Congress pauses expedited proceedings for aliens claiming asylum until an asylum officer can make a determination under subparagraph (B).  See 8 U.S.C. § 1225(b)(1)(A)(i)-(ii).  The final provision, or the "Designation Provision," allows the Attorney General, now the Secretary of Homeland Security, Awe v. Napolitano, 494 F. App'x 860, 863 (10th Cir. 2012),[13] to make the general rule for arriving aliens, of expedited removal, applicable to other groups, see Make the Road, 962 F.3d at 619.

### (I).    Certain Other Aliens: Designation Groups.

Section 1225(b)(1)(A)(i) applies to aliens inadmissible for fraud or misrepresentation, or lack of documentation.  See 8 U.S.C. § 1225(b)(1)(A)(i) (referencing inadmissibility under §§ 1182(a)(6)(C) or 1182(a)(7)).  Fraud, misrepresentation, and lack of documentation constitute only two of several inadmissibility grounds, however.  In § 1182(a) Congress enumerates other grounds, which include, among others, health-related grounds, criminal grounds, and security-related grounds.  See 8 U.S.C. § 1182(a)(1)-(10).  Read in this context, the Court reads § 1225(b)(2) as broader than § 1225(b)(1); § 1225(b)(2) governs the inspection and processing of applicants for

---

[13] The statute's reference to the Attorney General reflects prior administrative structure.  See Awe v. Napolitano, 494 F. App'x 863 n.3.  Congress transfers authority to commence removal proceedings and adjudicate naturalization applications to the Secretary of Homeland Security in 2002, effective March 1, 2003.  See Ajlani v. Chertoff, 545 F.3d 229, 231 n.2 (2d Cir. 2008); Batalova v. Ashcroft, 355 F.3d 1246, 1248 n.1 (10th Cir. 2004).  Accordingly, references to the "Attorney General" in § 1225 now means the Secretary of Homeland Security.

admission who fall outside the narrow subset subject to expedited removal under § 1225(b)(1), which includes those inadmissible on grounds other than fraud or lack of documentation.  See 8 U.S.C. § 1225(b)(2) (governing the inspection of "other aliens").

### (II).   Certain Other Aliens: Physical Presence.

Section 1225(b)(1) removes from expedited removal a second category of aliens.  See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).   Section 1225(b)(1)(A)(iii)(II) limits immigration officers' application of expedited removal to "certain other aliens," whom the United States has not admitted or paroled into the United States, and who does not show continuous physical presence in the country for the two-year period immediately preceding the inadmissibility determination.  8 U.S.C. § 1225(b)(1)(A)(iii)(II).   By negative implication, Congress excludes from expedited removal admitted aliens, paroled aliens, and aliens who can demonstrate two years of continuous physical presence, even if they remain classified as applicants for admission under § 1225(a)(1). See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).   The physical-presence limitation thus gives operative content to Congress' decision to treat certain non-admitted aliens present inside the United States as applicants for admission for inspection purposes.  See 8 U.S.C. § 1225(a)(1) (treating as an applicant for admission both an arriving alien and an "alien present in the United States who has not been admitted").

Reading § 1225 to encompass a subset of aliens present in the United States accords not only with the statute's text, but also with Supreme Court guidance.  In Jennings v. Rodriguez, 583 U.S. 281 (2018)("Jennings"), the Court implicitly recognizes this structure.  See 583 U.S. at 297. Justice Alito describes § 1225(b) as applying "primarily to aliens seeking entry into the United States." Jennings, 583 U.S. at 297.  The modifier "primarily" implies that § 1225(b) also reaches some aliens who are not seeking entry.  Aliens physically present within our borders, whom the United States has not admitted, are not "seeking entry," but instead are "seeking admission."  8

U.S.C. § 1225(b)(2)(A) (referring to an "alien seeking admission"). Justice Alito's further statement that "§ 1226 applies to aliens already present in the United States" creates no tension; both propositions coexist comfortably under the Court's reading of § 1225(b), which recognizes overlapping statutory categories rather than mutually exclusive ones.

The aliens whom § 1225(b)(1)(A)(iii)(II) covers includes, for example, aliens whose inspection at a port of entry is "deferred" by an immigration officer, and whom the officer temporarily permits the alien to enter the United States pending further inspection, see 8 C.F.R. § 235.2 ("Parole for deferred inspection."), as well as certain previously admitted aliens whose status reverts to that of an applicant for admission upon the commission of specified offenses, see 8 U.S.C. § 1101(a)(13)(C) (stating that a lawfully admitted alien "shall not be regarded as seeking an admission . . . unless the alien. . . . has committed an offense identified in section 1182(a)(2)). Congress authorizes expedited removal only where the applicant for admission cannot demonstrate two years of continuous physical presence. See 8 U.S.C. § 1225(b)(1)(A)(iii)(II). If an alien can demonstrate two years of physical presence, they are then subject to the usual removal proceedings under § 1229a, however, the alien remains an applicant for admission. See 8 U.S.C. § 1225(b)(2) (stating that an applicant for admission "shall be detained for a proceeding under section 1229a").

### (III).    Certain Other Aliens: Paroled.

At the same time, Congress distinguishes "parole into the United States," under 8 U.S.C. § 1182(d)(5)(A), from "conditional parole" under § 1226(a), which authorizes release from immigration custody pending removal proceedings, 8 U.S.C. § 1226(a)(2)(B). Conditional parole does not confer entry, does not alter an alien's status as an applicant for admission, and does not suspend the United States' pursuit of removal; conditional parole is similar to bail in the criminal context. See Cruz-Miguel v. Holder, 650 F.3d 189 (2d Cir. 2011)(stating that "akin to bail release in criminal cases, conditional parole merely permits an alien to remain at liberty based upon a

determination that he poses no risk of danger or flight *while his removal is actively sought*")(emphasis in the original).  The distinction between parole and conditional parole carries concrete statutory consequences.  Aliens "paroled into the United States" are not subject to expedited removal under § 1225(b)(1).  See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[14]  They may also seek adjustment of their immigration status under § 1255(a).  See 8 U.S.C. § 1255(a) (stating that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe").  Legislative history confirms the distinction between parole and conditional parole.  See Ortega-Cervantes v. Gonzales, 501 F.3d 1111 (9th Cir. 2007)(discussing the 1960 amendment to 1255(a).  In the 1960s, when Congress amends § 1255(a) to extend eligibility for adjustment of immigration status to paroled aliens, it did so with reference to parole granted under 8 U.S.C. § 1182(d), not to aliens who had entered without inspection and were later released from custody under the statutory precursor to § 1226(a).  S.Rep. No. 86–1651 (1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 3124-25, 3137 (extending § 1255 to "aliens paroled into the United States," but excluding those who "entered the United States surreptitiously").  This history indicates that Congress does not understand conditional parole for aliens who entered without inspection to be the same form of parole contemplated in § 1255 or in § 1225(b)'s exclusion from expedited removal.

Section 1225(b)(1), though textually narrower than § 1225(b)(2), performs the operational work within § 1225's inspection framework.  § 1225(b)(1) governs the inspection of "arriving" aliens and "certain other aliens," including aliens present in the United States who have not been

---

[14] The Court notes that persons who enter without inspection and are applicants for admission can qualify for parole under § 1182, see U.S.C. § 1182(d)(5)(A), or conditional parole under § 1226(a), see 8 U.S.C. § 1226(a)(2)(B).

admitted or paroled, and who cannot demonstrate two years of continuous physical presence.  8 U.S.C. § 1225(b)(1)(A)(i)-(iii).  By contrast, § 1225(b)(2) applies to the residual category of "other aliens" who are applicants for admission but fall outside the expedited-removal criteria and are therefore placed into the usual removal proceedings under § 1229a.  8 U.S.C. § 1225(b)(2).  The scale of these provisions illustrates their functional roles.  In 2024, CBP conducts over 416 million inspections at the border, see 2024 CBP Statistic, while approximately 255,000 aliens file I-485 applications, from within the United States, to adjust status to lawful permeant residence, see Number of I-485 Applications to Register Permanent Residence or Adjust Status By Category, Case Status, and USCIS Field Office or Service Center Location January 1, 2024 - March 31, 2024, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.uscis.gov%2Fsites% 2Fdefault%2Ffiles%2Fdocument%2Fdata%2Fi485_performancedata_fy2025_q1.xlsx&wdOrigi n=BROWSELINK (last visited Jan. 16, 2025).[15]  Roughly, these figures indicate that the overwhelming majority of admissibility determination occur in § 1225(b)(1)'s inspection context -- over ninety-nine percent -- while only a small fraction of applicants for admission proceed through the more cumbersome pathway in § 1225(b)(2).  In theory, § 1225(b)(2) covers more categories of aliens; in practical operation, however, the United States processes most aliens through § 1225(b)(1), and § 1225(b)(2) functions as a narrow backstop.  This structure reflects Congress' intentional division between summary inspection-based determinations near the point of entry and interior inspections where the reliability of rapid admissibility determinations is suspect.

---

[15] A foreign national, who is already present in the United States, generally fills out Form I-485 to attain lawful permanent resident status.  See Alicia Ward, United States Lawful Permanent Residents: 2023, United States Department of Homeland Security at 2 (Sep. 9, 2024)("LPR Statistics").  Foreign nationals who live abroad or seek to enter the United States through a port of entry do not use Form I-485.  See LPR Statistics at 2.

### iii.    **"Arriving" Aliens in § 1225(b)(1).**

Congress' words are important.  Section 1225 repeatedly focuses the reader on the word "arrive" -- "arriving aliens" in the title; aliens who "arrive" in applicants for admission; and "certain other aliens" immigration officers are to treat as if they are arriving.  Merriam-Webster defines "arrive" as an intransitive verb meaning "to reach a destination" or "to make an appearance: to come up on the scene."  Arrive, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/arrive.  (last visited on Jan. 18, 2026).  Congress envisions § 1225(b)(1) as generally applying to aliens who present at a port of entry upon reaching their destination -- the United States.  See 8 U.S.C. § 1225(b)(1)(A)(i) (stating the general rule of inspection).  These provisions are about applicants for admission who are seeking lawful entry, and that can occur at the border or on the interior when an alien arrives at an immigration office for deferred inspection or when an alien files Form I-485 to change their immigration status.  That Congress allows the Attorney General to extend this framework to "certain other aliens" present in the United States does not change Congress' intent that § 1225 is primarily about inspection for lawful entry; the extension confirms it.  8 U.S.C. § 1225(b)(1)(A)(iii).  Removing any doubt, Congress repeatedly employs the present participle "arriving."

Congress' use of the present participle "arriving" as an adjective modifying the noun "alien" is significant, because, in traditional grammatical terms, the present participle signals an imperfect or continuous aspect rather than a completed action.  See P. Peters, The Cambridge Guide to English Usage 409 (2004)(explaining particles "create different aspects for the verb" either "imperfect" or "perfect").  Unlike the past participle, which ordinarily conveys a completed or passive state, the present participle is active and describes an action that is ongoing or in progress.  See P. Peters, The Cambridge Guide to English Usage 409.  By choosing the active, imperfect form "arriving alien," Congress signals that § 1225(b)(1) applies to aliens who are in the process of

inspection and arrival, and not to those whose entry is completed long ago and whose presence in the United States is no longer properly understood as "arriving."

The textual distinction between "arriving" aliens and aliens present in the interior of the country reflects a longstanding principle of immigration law's relationship with the Due Process Clause. See Zadvydas, 533 U.S. 695 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). As Justice Scalia explains, the Due Process distinction "makes perfect sense: with regard to the question of what procedures are necessary to prevent entry, as opposed to what procedures are necessary to eject a person already in the United States." Zadvydas, 533 U.S. at 704 (Scalia, J., dissenting). That procedural observation applies with full force here, as the statutory language reflects our nation's understanding of immigration law. Applicants for admission, by presenting themselves for inspection, subject themselves to the United States immigration system. An alien who does not seek admission through inspection is in a different procedural posture than an alien who has started the process of lawful entry. That Congress makes stowaways, who attempt to enter without submitting to lawful inspection, not eligible to apply for admission under § 1225 is confirmation enough of the difference in procedural posture.

### iv.    Section 1225(b)(2): "Other Aliens".

After § 1225(b)(1) carries all of that water -- dividing applicants for admission into subgroups, specifying who is subject to expedited removal, and describing how certain aliens can seek asylum -- it is only then that § 1225(b)(2) comes over the horizon for consideration. Section 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." Jennings, 583 U.S. at 287. Congress entitles this provision "Inspection of other aliens" and labels § 1225(b)(2)(A) the rule "In general." Like § 1225(b)(1), it applies only to applicants for admission, but it governs a broader universe of aliens. See Jennings, 583 U.S. at

287 ("Section 1225(b)(2) is broader."). Section 1225(b)(2) addresses the inspection of "other aliens" that § 1225(b)(1) does not cover. 8 U.S.C. § 1225(b)(2). Congress is mindful, however, to distinguish this group of "other aliens" in § 1225(b)(2) from the "certain other aliens" in § 1225(b)(1)(A)(iii).

"In general . . . an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for proceedings under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A).[16] Section 1225(b) establishes two removal pathways that operate following an

---

[16] Section 1229 is titled "Initiation of removal proceedings" and sets forth the regular removal process of § 1229a. 8 U.S.C. § 1229. Under §§ 1229 and 1229a, the United States charges an alien with removability, serves the alien with a notice to appear, brings the alien before an immigration judge, permits the alien to present evidence and argument, and affords the alien Board of Immigration Appeals review and, ultimately, allows Courts of Appeals review. See United States v. Gonzalez-Fierro, 949 F.3d 512, 519 (10th Cir. 2020). Section 1229a provides for "usual removal proceedings," Thuraissigiam, 591 U.S. at 108-09 (discussing the usual removal proceedings from the expedited proceedings), which differ from the expedited removal process that § 1225(b)(1) describes. See 8 U.S.C. § 1229(a)(b)(4) (discussing the alien's "rights in the proceeding" compared with the immigration officers' determination without further hearings).

Section 1229a is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States," unless "otherwise specified in this chapter," including the "Expedited removal of aliens convicted of committing aggravated felonies," under 8 U.S.C. § 1228. 8 U.S.C. § 1229a(a)(3). Although 1229a is the exclusive procedure for removal proceedings, § 1229a does not mention "detention. 8 U.S.C. § 1229a. Section 1229 presupposes detention. See 8 U.S.C. § 1229(a)(2)(B) (stating that "[i]n the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F)"). Accordingly, the power to detain aliens during those removal proceedings must come from outside those sections. Indeed, the Supreme Court, in Jennings, all but confirms the authority to detain aliens civil during these proceedings comes from §§ 1225 and 1226. See 583 U.S. 289 ("In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).").

The United States' power to detain aliens that covers arriving aliens and "certain other aliens" is in § 1231, which is titled "Detention and removal of aliens ordered removed." 8 U.S.C. § 1231. Section 1225(b)(1) provides for "expedited removal." 8 U.S.C. § 1225(b)(1). When an "the officer [] order[s] the alien removed from the United States," 8 U.S.C. § 1225(b)(1)(A), a "removal period" starts in § 1231. 8 U.S.C. § 1231(a)(1)(B)(i). Section 1231(a)(1) states that,

immigration officer's inspection of an applicant for admission and which apply to three classes of aliens. The first pathway, in § 1225(b)(1), provides that, if an immigration officer determines that an alien "arriving in the United States" or "certain other aliens" present in the country are inadmissible, the officer orders removal without further hearing or review.   8 U.S.C. § 1225(b)(1)(A)(i).  The second pathway, in § 1225(b)(2), provides that immigration officers detain and remove "other aliens" under § 1229a's ordinary procedures.  8 U.S.C. § 1225(b)(2)(A).  Within this framework, § 1225(b) contemplates four classes of aliens or noncitizens: arriving aliens, <u>see</u> 8 U.S.C. § 1225(b)(1)(A)(i); applicants for admission present in the United States but for less than two years, <u>see</u> 8 U.S.C. § 1225(b)(1)(A)(iii); applicants for admission present in the United States for longer than two years but are seeking admission <u>see</u> 8 U.S.C. § 1225(b)(2)(A), and a residual category of other aliens, including crewmen and stowaways, whom are not eligible to apply for admission, <u>see</u> 8 U.S.C. § 1225(b)(2)(B).

The statute's language reflects an inspection-centered posture.  An immigration officer's inspection of an alien in the posture of seeking admission triggers both § 1225(b)'s removal

_____

"when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")."  8 U.S.C. § 1231(a)(1)(A).  Section 1231(a)(2) then discusses "Detention" and states, "In general, [d]uring the removal period, the Attorney General shall detain the alien."  8 U.S.C. § 1231(a)(2)(A).

As the Court discusses later, § 1226 governs apprehension and detentions of aliens.  Section 1226 authorizes arrest upon warrant, and permits release on bond or conditional parole unless mandatory detention applies.  <u>See</u> 8 U.S.C. § 1226(a), (c).  By regulation, when the United States detains an alien under § 1226(a), the alien receives an initial bond hearing before an immigration judge.  <u>See</u> 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1).  The removal proceedings that the alien receives, however, are pursuant to § 1229a.

Section 1225(b), by contrast, establishes expedited removal.  Aliens subject to § 1225(b)(1) may be ordered removed "without further hearing or review," save for the limited credible-fear process.  8 U.S.C. § 1225(b)(1)(A).  Under § 1225(b)(2), aliens the United States detains "for a removal proceeding" proceed under § 1229a just like those that the United States detains under § 1226.  A key difference between the United States detaining an alien under § 1225(b)(2) and § 1226 is not the ultimate process the alien receives during their § 1229a proceedings, but the initial bond hearing that applies only to § 1226 by regulation.

pathways -- expedited removal under § 1225(b)(1) and the usual removal under § 1225(b)(2) -- and the pathways operate as alternative outcomes of the inspection process.  Further confirming the inspection posture, § 1225(a)(2) specifies that stowaways are not eligible to apply for admission, and § 1225(b)(2)(B)(iii) correspondingly excludes stowaways from detention for non-expedited removal proceedings.  From this statutory pairing, i.e. the relationship between § 1225(b)(1) and § 1225(b)(2), the Court sees Congress' intent as tying the concept of an "applicant for admission" to inspection rather than to a freestanding status untethered from the inspection context.

That understanding aligns with §1101's statutory definition of "admission," which defines the term as "lawful entry . . . after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  The relationship between "applicant for admission" and lawful inspection also accords with § 1225(a)'s provision permitting an applicant for admission to withdraw an application for admission and depart immediately from the United States, reflecting Congress' expectation that the inspection process occurs at the threshold of entry and that aliens who do not wish to submit to that process may simply leave.  8 U.S.C. § 1225(a)(4).  Outside of that inspection framework, § 1225 provides no independent scheme for detaining aliens; it instead contemplates either inspection leading to admission or removal, or immediate departure in lieu of inspection.  The remaining § 1225 sections serve to reinforce that Congress is concerned with the inspection of applicants for admission at the border.

### v.    <u>Section 1225(b)(2)(A): An Alien Seeking Admission</u>.

Congress' words matter.  Section 1225 establishes an inspection-based regime governing the treatment of arriving aliens and aliens present in the country.  <u>See</u> 8 U.S.C. § 1225(a)(1).  Within that framework, § 1225(b)(2) operates as an exception to the "expedited" removal under § 1225(b)(1), providing aliens the usual removal proceeding, under § 1229a, only when three

conditions are met: (i) the alien is an applicant for admission; (ii) the alien is "seeking admission"; and (iii) the examining immigration officer determines that the alien is not clearly and beyond doubt entitled to be admitted.  8 U.S.C. § 1225(b)(2)(A).  Section 1225(b)(2)(A) distinguishes between the legal status of being an applicant for admission and the act of seeking admission.

Congress uses the phrase "seeking admission" only sparingly in § 1225 and always with precision.  Cf., 8 U.S.C. § 1225(a)(2) (providing that stowaways are not "eligible to apply for admission or to be admitted").  The phrase first appears in the inspection clause: "All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  The phrase appears again in the statements provision: "An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States."  8 U.S.C. § 1225(a)(5). And it appears a third time in § 1225(b)(2)(A). That the phrase is absent from the section otherwise is no coincidence.  In the inspection clause, Congress' use of "or" confirms that being an applicant for admission is not coterminous with seeking admission; the section treats them as related but distinct concepts.  8 U.S.C. § 1225(a)(3).  In the statement clause, Congress uses "seeking admission" to describe purposeful acts by the applicant for admission, linking the phrase to conduct rather than status.  8 U.S.C. § 1225(a)(5).  When Congress then employs the same phrase again in § 1225(b)(2)(A), it again does so such that the phrase helps readers understand applicants for admission.  The Court sees no reason to treat the insertion as accidental or redundant.

Ordinary meaning confirms the point.  "Seek" means "to go in search of," "to ask for," or "to request."  Seek, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/seek.  (last visited on Jan. 19, 2026).  "Seek" denotes action directed

toward a goal, and not a static label. "Admission" or "admitted" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). With those definitions in mind, "seeking admission" naturally refers to the act of "asking for" or "requesting" lawful entry through inspection or authorization. The phrase therefore narrows the broader universe of "applicants for admission," which encompasses everyone present in the United States, who has not been admitted, and arriving aliens. 8 U.S.C. § 1225(a)(1). Although the phrase "seeking admission" narrows the class of aliens to whom § 1225(b)(2) applies, it would be mistaken to read the provision as limited exclusively to physical border encounters. An alien may seek lawful entry at a port of entry, but an alien may also seek lawful admission from within the United States through statutory mechanisms such as an application for adjustment of status on Form I-485 or other congressionally authorized procedures for obtaining lawful admission.

Congress' drafting is methodical. Section 1225(b)(1) governs arriving aliens and designated "certain other aliens." 8 U.S.C. § 1225(b)(1). The use of "certain other aliens" in §§ 1225(b)(1) and 1225(b)(1)(A)(iii) is careful craftsmanship by Congress to aid readers in not confusing those aliens with the "other aliens" it describes in § 1225(b)(2). Congress is careful, because it does not want applicants for admission receiving removal proceedings under § 1229a when expedited proceeding are appropriate. Reading "seeking admission" to do real work preserves that purpose and the section's structure. Reading the phrase as surplusage would collapse it. See Castañon-Nava, 2025 WL 3552514 *9 (stating the presumption against reading a phrase as superfluous is 'strongest when an interpretation would render superfluous another part of the same statutory scheme')(quoting Marx v. Gen. Rev. Corp., 568 U.S. 371, 386 (2013)).

The structure of § 1225 confirms this reading. Section 1225(b)(1) sets forth the general rule governing inspections of applicants for admission. See 8 U.S.C. § 1225(b)(1)(A). Section

1225(b)(2) then appears on the horizon as a residual provision, applying only to "other" applicants for admission that § 1225(b)(1) does not cover.  See Jennings, 583 U.S. at 287 (describing § 1225(b)(2) as the "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)").  This sequencing reflects a familiar statutory pattern.  Congress states the general rule first and then follows it with the exceptions to the general rule.  Reading § 1225(b)(2) to govern all applicants for admission, without qualification, inverts the statutory pattern, allowing the residual provision to swallow the general rule.  Statutory interpretation does not permit such an inversion.

### c.    8 U.S.C. § 1225(c).

Section 1225(c) covers the removal of inadmissible aliens based on security and related grounds, including removal without further hearing, the Attorney General's review of a removal order, and submission of a statement and information for the attorney general to consider.  See 8 U.S.C. §§ 1225(c)(1)-(3).  Subparagraph (c)(1) states that, if an immigration officer "suspects that an arriving alien may be inadmissible under . . . section 1182(a)(3) of this title," the immigration officer shall "order the alien removed."  8 U.S.C. § 1225(c)(1).  The specific subparagraphs that § 1225(c)(1) contemplates are subparagraphs §§ 1182(a)(3)(A)-(C).  See 8 U.S.C. § 1225(c)(1).

Section 1182(a)(3) covers the class of aliens who are "ineligible for visas or admission" for security related reasons.  8 U.S. C. § 1182(a)(3).  Subparagraph 1182(a)(3)(A) is the general rule that applies to any alien who "seeks to enter" the United States for nefarious purposes, including espionage and attempting to overthrow the government.  8 U.S. C. § 1182(a)(3)(A).  Similarly, subparagraph 1182(a)(3)(B), which applies to terrorist activities, contemplates an alien engaging in terrorist activity "after entry" into the United States.  8 U.S.C.§ 1182(a)(3)(B)(i)(II).  Finally, subparagraph 1182(a)(3)(C) applies generally to aliens "whose entry or proposed activities

in the United States . . . would have potentially serious adverse foreign policy consequences." 8 U.S.C. § 1182(a)(3)(C)(i).

  **d.**  **<u>8 U.S.C. § 1225(d)</u>.**

  Section 1225(d) provides immigration officers with "[a]uthority relation to inspection." 8 U.S.C. § 1225(d). The authority that Congress gives is the authority to search conveyances, or vehicles,[17] order detention and delivery of arriving aliens, administer oaths and consider evidence, and to issue subpoenas. <u>See</u> 8 U.S.C. § 1225(d)(1)-(4). The authority to search vehicles allows immigration officers to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States." 8 U.S.C. § 1225(d)(1). The authority to detain allows immigration officers to order anyone "bringing an alien . . . to the United States" to detain the alien "on the vessel or at the airport of arrival, and to deliver the alien to an immigration officer for inspection or to a medical officer examination." 8 U.S.C. § 1225(d)(2)(A)-(B). Section 1225(d)(3) relates to immigration officers' ability to administer oaths and take evidence "touching the privilege of any alien . . . to enter, reenter, transit through, or reside in the United States." 8 U.S.C. § 1225(d)(3). Finally, the subpoena authority allows immigration officers to require "the attendance and testimony of witnesses . . . and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter." 8 U.S.C. § 1225(d)(4).

  Section 1225(d) reinforces that § 1225's scheme operates in an inspection-based posture. Congress entitles this subsection "Authority relating to inspection," and Congress frames the

---

  [17] The Merriam-Webster Dictionary defines "conveyance" as "a means or way of conveying: such as . . . a means of transport: vehicle." Conveyance, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/conveyance. (last visited on Jan. 14, 2026).

powers it confers around identifying, examining, and processing individuals at or near the point of entry.  8 U.S.C. §§ 1225(d)(1)-(4).  The authority to board and search vessels, aircraft, and other conveyances reflects a focus on intercepting and examining aliens who are arriving or are at the threshold of entry.  See 8 U.S.C. § 1225(d)(1).  Further reinforcing the threshold character of the statute, §§ 1225(d)(2)(A)-(B) limits the immigration officers' authority to direct carriers to detain aliens on vessels or at airports of arrival, and to deliver those aliens for inspection, underscoring that the provision operates in the context of entry screening.  See 8 U.S.C. §§ 1225(d)(2)(A)-(B).

The remaining inspection authorities follow a similar theme.  Congress authorizes immigration officers to administer oaths and to take evidence concerning an alien's privilege to enter, to reenter, to transit through, or to reside in the United States, and to issue subpoenas for testimony and documents relating to that privilege.  See 8 U.S.C. § 1225(d)(3)(4).  These provisions contemplate fact finding and adjudicative functions tied to determining admissibility and entry status, and not generalized deportation or removal functions.  Read in context, § 1225(d) supplies the operational tools necessary for immigration officials to conduct inspections and to make entry determinations, further confirming that Congress does not envision § 1225's detention and removal mechanisms apart from the inspection of an arriving applicant for admission inspect.

By contrast, § 1226 speaks in remarkably different terms.  Section 1226 governs the "Apprehension and detention of aliens."  8 U.S.C. § 1226.  This section employs language associated with warrants, see 8 U.S.C. § 1226(a); work authorization, see 8 U.S.C. § 1226(a)(3); and the prior convictions, see 8 U.S.C. § 1226(c)(E)(ii).  In the Court's view, the contrast between the inspection-focused terminology of § 1225 and the more ordinary, post-entry language of § 1226 reflects Congress' considered judgment that different procedures are appropriate for preventing entry than for removing individuals who have already entered and established presence.  Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, (2020)(Alito, J.)("Thuraissigiam")(discussing the

"century-old rule regarding the due process rights of an alien seeking initial entry" and an alien who has "'effected an entry'")(quoting Zadvydas, 533 U.S. at 693).

Looking at existing case law reflects that different courts have taken different approaches to the interpretation of § 1225.  The Seventh Circuit in Castanon-Nava v. United States Department of Homeland Security, 161 F.4th 1048 (7th Cir. 2025)("Castanon-Nava"), addresses whether the United States is likely to succeed on the merits in its argument that § 1225(b)(2)(A) allows the detention of any noncitizen who is unlawfully present in the interior of the United States. 161 F.4th at 1060. Looking to § 1225(b)(2)(A)'s language, the Seventh Circuit contemplates what it means to be "seeking admission." 161 F.4th at 1061. Despite the United States' argument that an "applicant for admission" is synonymous with a person "seeking admission," the Seventh Circuit holds that unlawful noncitizens are only seeking admission when they are at the border. 161 F.4th at 1061. The Seventh Circuit offer two main arguments to support that conclusion.

First, the Seventh Circuit believes that if the United States' interpretation of seeking admission is adopted, it would render § 1225(b)(2)(A)'s use of the phrase "seeking admission" superfluous. 161 F.4th at 1061. Second, the Seventh Circuit notes that "the difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law. Indeed, 'the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.'" 161 F.4th at 1061-62 (citing Zadvydas,, 533 U.S. at 693). The Seventh Circuit therefore concludes that the United States is not likely to succeed on the merits of their arguments that those individuals, whom ICE arrests without a warrant on the interior of the country, are subject to mandatory detention under § 1225(b)(2)(A). 161 F.4th at 1062.

By contrast, in Singh v. Noem, No. CIV 25-1110 JB/KK, 2026 WL 146005 (D.N.M. Jan. 20, 2026)("Singh") the Court begins by looking at § 1225 as a whole.  See Singh, 2026 WL 146005,

at * 33.  Section 1225(b)(1) applies to "applicants for admission" who "arrive" in the United States, or who have been in the United States continuously for less than two years, whereas Section 1225(b)(2) applies to "other aliens" that are applicants for admission seeking admission.  Singh, 2026 WL 146005, at * 33.  The Court understands § 1225(b)(1) to be the default provision for § 1225, and that the majority of aliens whom the United States properly holds under § 1225 will fall within its scope; "that is, aliens qualifying as applicants for admission who either arrive at the border, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation, or aliens who are present in the country continuously for less than two years immediately before the date of the determination of inadmissibility, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation."  Singh, 2026 WL 146005, at * 34.  Turning then to § 1225(b)(2), the Court concludes that this provision is a "catchall provision."  Singh, 2026 WL 146005, at * 34 (citing Jennings, 583 U.S. at 287).  Section 1225(b)(2) is not, however, a catchall such that it covers every applicant for admission; instead it only covers applicants for admission who seek admission, such as applying to achieve some legal status.  See Singh, 2026 WL 146005, at * 34.  In reaching this conclusion, the Court rejects the United States' argument that all applicants for admission are seeking admission, because "[t]reating these phrases synonymously is contrary to the presumption that Congress intends different words or phrases to be accorded different meanings."  Singh, 2026 WL 146005, at *35.  The Court also rejects, however, the argument that "seeking admission" must only apply to aliens arriving at the border, because this conclusion equates the phrase "seeking admission" with an "arriving alien," which is also contrary to the presumption that Congress intends different words or phrases to be accorded different meanings.  Singh, 2026 WL 146005, at *35.  The Court therefore reads § 1225(b)(2) to afford meaning to both the phrase "applicant for admission" and "seeking admission" by

concluding that seeking admission requires some affirmative action on the part of the applicant for admission.  See Singh, 2026 WL 146005, at *35.

Finally, the Fifth Circuit in Buenrostro-Mendez v. Bondi, No. 25-20496, 2026 WL 323330, at *1 (5th Cir. February 6, 2026)("Buenrostro"), contemplates what the phrase "seeking admission" means in § 1225(b)(2)(A). 2026 WL 323330, at *1.  In Buenrostro, both petitioners are citizens of Mexico who enter the United States illegally. See 2026 WL 323330, at *3. DHS encounters each petitioner in 2025, and, upon inspection, immigration officers determine that each petitioner in inadmissible as an alien present in the United States without having been admitted or paroled. See 2026 WL 323330, at *3.  DHS commences removal proceedings under § 1229a against both petitioners, directing that the United States detain them under § 1225(b)(2)(A) for the duration of the proceedings. See 2026 WL 323330, at *3. Both petitioners seek bond hearings before an immigration judge, but both immigration judges conclude that the petitioners are ineligible for a bond hearing under § 1225(b)(2). See 2026 WL 323330, at *3.  As a result of the immigration judge's ruling, the petitioners file habeas petitions seeking release from detention or a bond hearing under § 1226(a).  The district court judges in both cases grant the habeas petitions and order a bond hearing.  See 2026 WL 323330, at *3.

In a two to one decision, the Fifth Circuit holds that neither petitioner is entitled a bond hearing and are instead properly detained under § 1225(b)(2)(A).  See 2026 WL 323330, at *10. Although the petitioners argue that they are not subject to § 1225(b)(2)(A) detention, because "seeking admission" refers only to those aliens who are submitting themselves for inspection by an immigration officer, and the United States detained the petitioners in the United States' interior, the Fifth Circuit rejects this argument by concluding that those aliens who are applicants for admission are always seeking admission.  2026 WL 323330, at *4.  The Fifth Circuit offers several reasons to support that conclusion.

First, the Fifth Circuit holds that the ordinary meaning of the language in § 1225(b)(2)(A) supports its conclusion that applicants for admission are seeking admission.  See 2026 WL 323330, at *4.  The Fifth Circuit asserts that there is no material disjunction -- by terms of the statute of the English language -- between the concept of applying for something and seeking something.  See 2026 WL 323330, at *4.  "When a person applies for something, they are necessarily seeking it." 2026 WL 323330, at *4.  "Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same, regardless whether the person actively engages in further affirmative acts to gain admission."  2026 WL 323330, at *4.  The Fifth Circuit therefore holds that the everyday meaning of § 1225(b)(2)(A)'s terms confirms that an applicant for admission is not independent from seeking admission.  See 2026 WL 323330, at *4.

Second, the Fifth Circuit points to § 1225(a)(3) which specifies that "[a]ll aliens (including crewman) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  See 2026 WL 323330, at *5.  "The use of 'or otherwise' suggests that 'applicants for admission' are a subset of those 'seeking admission.'"  See 2026 WL 323330, at *5.  As another textual hook, the Fifth Circuit points to § 1225(a)(5) as reinforcing the proposition that applicants for admission are seeking admission.  See 2026 WL 323330, at *6.  Section 1225(a)(5) states: "An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States . . . ." 8 U.S.C. § 1225(a)(5).  The Fifth Circuit concludes that § 1225(a)(5)'s language "strongly suggests that those who are applicants for admission are seeking admission."  2026 WL 323330, at *6.

Third, the Fifth Circuit notes that if Congress had intended an alien seeking admission to mean an arriving alien, it would have used the word arriving alien.  See 2026 WL 323330, at *6.

Congress did not hesitate to use the arriving alien language elsewhere in §§ 1225(a)(2), (c)(1), and (d)(2).  See 2026 WL 323330, at *6.

Fourth, the Fifth Circuit cites Jennings as support for its conclusion that those who are applicants for admission are seeking admission.  See Buenrostro, 2026 WL 323330, at *8.  In Jennings, according to the Fifth Circuit, the Supreme Court explains that "§ 1225(b) applies to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)."  2026 WL 323330, at *6 (citing Jennings, 583 U.S. at 297).  The Fifth Circuit states:

> That language supports the government's contention that 'applicants for admission' are according to the statute seeking entry or admission. And it suggests that when the Supreme Court described § 1225 as applying to aliens 'seeking admission,' it understood that to mean aliens who, like the petitioners here, are present in the United States without admission.

2026 WL 323330, at *8.  Accordingly, the Fifth Circuit in Buenrostro holds that applicants for admission are seeking admission.

### 3.    Due Process.

The courts cannot interpret the INA and the role § 1225 plays in its statutory scheme apart from the Constitutional principles that historically govern the relationship between due process and the sovereign authority to admit or exclude noncitizens.  See Thuraissigiam, 591 U.S. at 139-140.  The Court is mindful, however, to differentiate between due process the statute requires and Constitutional Due Process.  See Rodriguez v. Marin, 909 F.3d 252 (9th Cir. 2018)(stating that the Supreme Court, in Jennings, "chose to answer only the question whether the statutory text itself included a limit on prolonged detention or a requirement of individual bond hearings . . . . The Court then remanded the constitutional issues to our court").  Below, the Court details the law regarding: (i) Constitutional Due Process, (ii) immigration law and due process, and (iii) how those bodies of law shape courts' statutory interpretations of the INA.

### a.    The Due Process Clause.

The Fifth Amendment to the United States Constitution states that the government shall not deprive any person "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V, § 1.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires the government to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that the government cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).

### i.    Procedural Due Process.

The Tenth Circuit prescribes a two-step inquiry in determining whether the defendant violates an individual's procedural due process rights: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).  "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court requires "due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at

571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," and "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty", the Supreme Court states the following:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

"To have a property interest in a benefit, a person clearly must have more than an abstract

need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d at 1079.  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334.  The Supreme Court explains that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee

who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

The United States Court of Appeals for the Second Circuit states:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  See Black v. Decker, 103 F.4th 133, 148 (2d Cir. 2024)(stating that Mathews v. Eldridge 'remains a flexible test,' and takes account of individual circumstances" (quoting Rodriguez Diaz v. Garland, 53 F.4th 1189, 1206 (9th Cir. 2022))).  The required hearing depends on: (i) the private interest at stake; (ii) the risk of erroneous deprivation given the procedures the government already guarantees, and whether additional procedural safeguards prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest

is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concludes that the New Mexico Department of Health violates due process when it affords a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it affords her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also concludes a municipality does not deny due process to tenured city employee when the city fired him, because the city affords him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a State employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d at 1299, aff'd 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## ii.    **Substantive Due Process**.

There are two substantive due process claims: (i) where the plaintiff alleges that the government infringes upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702, 721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action deprives arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's

application of stomach pumping to force an arrestee to vomit shocked the conscience). The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018). But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards"). But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that, "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks-the-conscience test to executive actions)(quoting, see, e.g., Leatherwood v. Allbaugh, 861 F.3d 1034, 1046 n.11 (10th Cir. 2017)(explaining both tests could be used in case about revocation of a defendant's suspended sentence)).

The fundamental rights approach proceeds in three steps. See Abdi v. Wray, 942 F.3d at 1028. First, the court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'" Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21). Second, the court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference." Abdi v. Wray, 942 F.3d at 1028 (quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)). Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny. See Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is

narrowly tailored to achieve a compelling governmental purpose"). If the right is not fundamental, however, the Court applies rational basis review. See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is requires "only when fundamental rights are involved").

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force does not shock the conscience even if the suspect does not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)). For Executive action to shock the conscience, that action must be more than mere negligence. E.g., Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)("Moore"). Indeed, even a reckless official's or the action of one bent on injuring a person do not necessarily shock the judicial conscience. Moore, 438 F.3d at 1040. "'Conduct that shocks the judicial conscience' is 'deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.'" Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir.2013)("Hernandez")(quoting Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir.2008)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or 'employed it as an instrument of oppression.'" Hernandez, 734 F.3d at 1261 (quoting Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir.2008)). "The behavior complained of must be egregious and outrageous." Hernandez, 734 F.3d at 1261. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998)(stating that Rochin v. California, 342 U.S. 165 (1952) set the "benchmark" of executive abuse of power at "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct'")(quoting Rochin v. California, 342

U.S. at 172-173); Breithaupt v. Abram, 352 U.S. 432, 435 (1957)("We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency.")(quoting Rochin v. California, 342 U.S. at 174).

b.    <b><u>Due Process and Immigration Law</u></b>.

"[T]he power to admit or exclude aliens is a sovereign prerogative."  Landon, 459 U.S. at 32 (citing as examples United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950), and Nishimura Ekiu v. United States, 142 U.S. 651, 659-60 (1892)).  See Thuraissigiam, 591 U.S. at 139 (stating the sovereign's prerogative is a "fundamental proposition").  The United States' plenary power to admit or exclude aliens is no longer plenary once an alien enters the country,  see Landon, 459 U.S. at 32 ("Once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."), because the Due Process Clause applies to "all persons," Zadvydas, 533 U.S. at 693.  In 1886, the Supreme Court says:

> The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

Yick Wo v. Hopkins, 118 U.S. at 369 (quoting U.S. Const. amend. XIV, § 1).  Yick Wo v. Hopkins deals with California detaining Chinese aliens without due process of law.  118 U.S. at 368-369. Accordingly, whether an alien is "within" the United States is a determination with Constitutional significance.  See Leng May Ma v. Barber, 357 U.S. 185, 188 (1958)("Leng May Ma")(stating that the Court recognizes "additional rights and privileges" for alien "within the United States after an entry, irrespective of its legality").  Immigration law balances the United States' prerogative to

admit or exclude with the constraints the Due Process Clauses places on United States by distinguishing between aliens who are "on the threshold of initial entry," Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)("Mezei"), and those who gain a "foothold" or effect entry in the United States, see Kaplan v. Tod, 267 U.S. 228, 258 (1925)("Kaplan"). Congress legislates against this settled Constitutional background of aliens at the threshold of entry and those who effect an entry.

### i.    On the Threshold of Entry.

"The entry-doctrine fiction has always determined when and under what circumstances due process applies in proceedings." Kurzban, supra, chapter 3, § 1.H, at 80. Although IIRIRA ends the traditional distinction between exclusion and deportation proceedings, the entry doctrine endures regarding whether someone has Constitutional rights if they are in the United States, even if the United States has not admitted the alien. See Kurzban, supra, chapter 3, § 1.H, at 80. For more than a century, the Supreme Court recognizes that an alien seeking entry "requests a privilege," Landon, 459 U.S. at 32, and possesses only those procedural protections which Congress chooses to provide, because the power to admit or exclude aliens is a core sovereign prerogative, see U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). The United States' power over aliens on the "threshold of entry" does not change because an alien sets foot on United States' soil. Thuraissigiam, 591 U.S at 140 (stating that, even if the alien makes his way "25 yards into U.S. territory," he is treated as an applicant for admission "'on the threshold'" of entry)(quoting Mezei, 345 U.S. at 212). Nor does the power change because an alien is "paroled elsewhere in the country for years pending removal"; they, too, are "'treated for due process purposes 'as if stopped at the border.'" Thuraissigiam, 591 U.S at 139 (quoting Mezei, 345 U.S. at 215). Thus, the sovereign's prerogative endures for any alien stopped

at the border or "detained shortly after unlawful entry" despite circumstances that might suggest the alien effects an entry. <u>Kaplan</u>, 267 U.S. at 257-58 (stating that, "in theory of law," an alien is inadmissible, but immigration officers permit the aliens to reside in the United States for nine years, nonetheless remains "at the boundary line" and for purposes of due process has "gained no foothold in the United States" for purposes of due process). <u>See</u> <u>Leng May Ma</u> 357 U.S. at 188-90 (1958)(stating that an alien "paroled" into the United States pending admissibility has not effected an "entry"). Aliens, whom the United States treats as "at the boundary line," receive less Constitutional Due Process protections than an alien who effects an entry without first encountering the United States.

### ii.    <u>Effected Entry</u>.

By contrast, once an alien effects entry and develops a presence within the United States, removal implicates greater Constitutional protections. <u>See</u> <u>Landon</u>, 459 U.S. at 34 ("Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation."). Whether an alien effects entry is not purely a question of presence in the country or temporal conditions; the question goes to the connection and the relationship between the United States and the alien. <u>See</u> <u>United States v. Verdugo–Urquidez</u>, 494 U.S. 259, 271 (1990)(stating in dicta that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); <u>Kwong Hai Chew v. Colding</u>, 344 U.S. 590, 596 n.5, (1953)("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders."); <u>Yamataya v. Fisher</u>, 189 U.S. 86, 100-01 (1903)(withholding judgment on question "whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for

too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed").

For example, in Osorio-Martinez v. Attorney General of the United States, 893 F.3d 153 (3d Cir. 2018)("Osorio-Martinez"), the United States Court of Appeals for the Third Circuit considers two classes of aliens subject to expedited removal under § 1225(b) and the related jurisdiction-stripping provision in § 1252. See Osorio-Martinez, 893 F.3d at 162-63. The first class consists of aliens "apprehended within hours of entering the country," Osorio-Martinez, 893 F.3d at 166, while the second class consists of aliens physically present in the United States who qualify for Special Immigrant Juvenile status under 8 U.S.C. § 1101(a)(27)(J). See Osorio-Martinez, 893 F.3d at 163. In Castro v. Department of Homeland Security, 835 F.3d 422 (3d Cir. 2016)("Castro"), the Third Circuit addresses the first class and holds that § 1225 does not violate the Constitution, reasoning that the petitioners' claims are "based on physical presence alone," and the claims arise in the context of aliens seeking initial entry or whom are apprehended immediately after entry. Osorio-Martinez, 893 F.3d at 166 (citing Castro, 835 F.3d at 448). See Castro, 835 F.3d at 448 (stating that "most of the cases cited above did not involve aliens who were seeking initial entry to the country or who were apprehended immediately after entry."). By contrast, in Osorio-Martinez, the Third Circuit holds that § 1252's jurisdiction-stripping clause is unconstitutional as applied to the second class of aliens, concluding that those aliens have "significant ties to this country" sufficient to trigger greater constitutional protection. Osorio-Martinez, 893 F.3d at 167. The Third Circuit thus reaffirms the longstanding distinction between aliens at or near the threshold of entry, and those who have effected entry, and establish presence within the United States for purposes of due process analysis.

Because the Constitution distinguishes between aliens who effect an entry and those who remain at the threshold of entry, an alien who enters the United States may, in certain

circumstances, receive greater procedural protections than an alien seeking initial admission.  The

Supreme Court has repeatedly explained that, for aliens at the threshold of entry, the Constitution

requires no procedural process beyond that which Congress has provided by statute to govern their

application.  See Mezei, 345 U.S. at 212 ("'Whatever the procedure authorized by Congress is, it

is due process as far as an alien denied entry is concerned.'")(quoting United States ex rel. Knauff

v. Shaughnessy, 338 U.S. 537, 544 (1950).[18]

---

[18] While the Supreme Court has said that Constitutional Due Process for _____ aliens is all
the process that Congress gives, that does not seem like sound Constitutional analysis for several
reasons.  First, the Constitution exists before any immigration statute, so the Constitution provided
some protection to aliens before Congress passes the first immigration statute in _____.  The
question is what Due Process required before the first statute.  Presumably there was some
protections for aliens before that statute.  It seems better to decide what the Constitution provided
then and provides now then just refer to a statute.

Second, the Court is uncomfortable with the idea that every violation of the statute is a
Constitutional violation.  Normally, the Constitution is a floor, and Congress must provide process
above the floor to be Constitutional.  By describing Due Process to be what the Legislature say it
so, the Court is concerned that the Supreme Court is not giving Congress or the lower courts
guidance what Due Process is.  In other words, saying that that the rule is that whatever Congress
gives is Constitutional Due Process is no guidance at all.

Third, ever since Marbry v. Madison, the Court has insisted that it is the arbitrator of what
the Constitution means.  In the immigration area, the Supreme Court gives this power to Congress.
When the lower courts desperately need guidance, the Supreme Court is not to be found.

Fourth, when Congress changes the law, the Constitution changes.  Congress decides what
the Constitution means and protects.  Thus, what can happen is that Constitutional protections can
go and down.  For the nation and for the federal judiciary; that Constitutional protections can go
down is odd.

It seems that the best approach would be for the Supreme Court to decide this whatever
Congress says at decide what it does in other areas where the Constitution requires.  In other words,
the Supreme Court needs to do what Chief Judge Marshal in Marbury v. Madison claims as its
own job.  The Supreme Court needs to decide what the Constitution protects.

Procedural Due Process requires notice and the opportunity to be heard.  Notice probably
is not the issue if the United States is detaining the alien; the issue is the hearing.  Likely, the
United States is detaining the alien or about to detain the alien.  The issue probably is removal or
not removal, and detention if removal.  That probably all the Due Process gives.  It does not require
a bond hearing, any partial burden of proof, or any burden of proof on the United States.  It seems
that fleshing out what the Constitution minimally requires actually is makes more sense than
referring to the statute for Constitutional analysis.

The Court undertakes this due process analysis in <u>Singh</u>, and concludes that the Due Process Clause does not afford Singh any greater procedural due process rights than the statute affords, because Singh is an alien subject to the entry-fiction doctrine.  <u>See Singh</u>, 2026 WL 146005, at * 39.  Further, looking to § 1225(b)(2), the Court determines that the statute does not afford Singh the right to any process beyond an initial inspection to determine that the "alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2).  This does not mean, however, that Singh does not have any due process protections at all, because the Court determines that all aliens, whether subject to the entry-fiction doctrine or territorial standing, have substantive due process rights beyond what the statute affords.  <u>See Singh</u>, 2026 WL 146005, at * 39.  Continued detention without process may violate "an alien subject to the entry fiction's substantive due process rights if immigration detention becomes punitive." <u>Singh</u>, 2026 WL 146005, at * 39.  The Court concludes, however, that Singh's detention to date, approximately four months, is not so long as to qualify as punitive and therefore is not a violation of his due process rights.  <u>See Singh</u>, 2026 WL 146005, at * 39.

### iii.    Paroled and Conditional Parole.

Consistent with the "effected entry" framework, Congress has long exercised the power to permit an alien's physical presence within the United States while treating that individual, as a matter of law, as remaining at the threshold of entry -- a legal fiction most clearly embodied in the parole doctrine.  "[A] deferred inspection necessarily involves parole into the United States under INA § 212(d)(5)," 8 U.S.C. § 1182(d)(5).  Charles Grodan, Stanley Madman, Yale-Loser, Immigration Law and Procedure, § 8.05 [2][d], at 8-17 ("Gordan").  Parole permits physical ingress to the United States without formal admission; "conceptually, a person remains on the border, lacking the rights that accompany admission."  Gordan, supra, § 8.05[2][d], at 8-17.  Stated

another way, parole is not an admission -- either at the border or out of detention.  See Leng May Ma v. Barber, 357 U.S. at 190; 8 U.S.C. § 1282(d)(5).

Congress' parole provisions reinforce the distinction between physical presence and legal entry that runs throughout immigration law.  See Kaplan, 267 U.S. at 257-58.   Section 1182(d) authorizes the Secretary of Homeland Security to "parole into the United States" an alien applying for admission for "urgent humanitarian" or "significant public benefit" reasons, while expressly providing that such parole "shall not be regarded as an admission."  8 U.S.C. § 1182(d)(5)(A). Parole therefore permits an applicant for admission to reside temporarily within the United States while remaining, in theory of law, at the threshold of entry.  See Kaplan, 267 U.S. at 257-58.  The parole framework, thus, allows the political branches to accommodate humanitarian and administrative needs without conferring the constitutional and statutory protections that attach to aliens the United States admits or those who establish a presence within the country.

### c.    Statutory Due Process.

In balancing the sovereign's prerogative to admit or exclude with the Due Process Clause's protections of all persons within the United States borders, the Supreme Court issues several opinions, in Zadvydas, Jennings, and Thuraissigiam, interpreting the INA touching on the issues of due process.  Although the legal questions that the Supreme Court confronts in each of the cases is not the same, the legal discussion is instructive on how to navigate the intersection of immigration law and due process.

### i.    Supreme Court Guidance.

In Zadvydas, the Supreme Court considers whether the immigration detention statute governing post-removal-order custody, see 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), authorizes the indefinite detention of aliens whom the United States cannot deport.  See Zadvydas, 533 U.S. at 682.  Both petitioners are lawful permanent residents whom the United States determines are

- 59 -

removable based on their criminal convictions.  See 533 U.S. at 684-86.  After the statutory ninety-day removal period expires, the United States can repatriate neither petitioner because no country will accept them.  See 533 U.S. at 684-86.  The United States nevertheless continues to detain them under the post-removal detention statue, despite the ninety-day timeframe that Congress places in §1231(a)(6).  See 533 U.S. at 682.  The petitioners file habeas petitions, under 28 U.S.C. § 2241, arguing that permanent confinement is contrary to the Constitution.  See Zadyvdas, 533 U.S. at 685.

The Supreme Court begins by stating a "statute permitting indefinite detention of an alien would raise a serious constitutional problem."  See Zadyvdas, 533 U.S. at 690.  "The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.'  Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that Clause protects." Zadyvdas, 533 U.S. at 690 (quoting the U.S. Const. amend. V, § 1)(alterations in the original). Continuing with its analysis, the Supreme Court states that only a sufficiently strong governmental interest, accompanied by adequate procedural safeguards, can justify civil detention.  See Zadyvdas, 533 U.S. at 690.  Preventing flight and protecting the community can justify limited detention, but the Supreme Court states that indefinite detention without a realistic prospect of removal cannot be Constitutional.  See Zadyvdas, 533 U.S. at 692.  Importantly, the Supreme Court rejects the United States reliance on Mezei, explaining that, once an alien enters the United States, "the legal circumstances change[]," because the Due Process Clause applies to all persons within the United States, regardless of the legality of their presence.  Zadyvdas, 533 U.S. at 693.

To avoid the Constitutional problem, the Supreme Court construes 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to contain an implicit temporal limitation that the statute authorizes detention only for "a period reasonably necessary" to accomplish removal.  Zadyvdas, 533 U.S. at 689.  The

Supreme Court adopts a "presumptively reasonable" six-month detention period.  Zadvydas, 533

U.S. at 700-01.  After six months, if the alien can show that removal is not reasonably foreseeable,

continued detention becomes unauthorized unless the United States rebuts that showing.  See

Zadvydas, 533 U.S. at 701.  The Supreme Court thus reaffirms that, while Congress possesses

broad authority over immigration, this authority remains subject to Constitutional limits once an

alien effects an entry and establishes a presence in the United States.[19]

In  Jennings,  the Supreme Court considers whether 8 U.S.C. §§ 1225(b), 1226(a), and

1226(c) implicitly requires periodic bond hearings or impose a temporal limitation on detention.

See Jennings, 583 U.S. at 289.  Respondent Alejandro Rodriguez, in Jennings, is a lawful

permanent resident whom the United States detains under § 1226, because he has several criminal

convictions.  See Jennings, 583 U.S. at 289-90.  The United States Court of Appeals for the Ninth

Circuit certifies a class of aliens that the United States detains under 8 U.S.C. § 1225(b), 1226(a),

and 1226(c) for longer than six months without providing a hearing justifying the detention, and

names Rodriguez as the class representative.  See Jennings, 583 U.S. at 290-91.  The Ninth Circuit

concludes those provision mandate a bond hearing every six months, invoking the Constitutional

---

[19] In Zadvydas, the Supreme Court addresses post-removal-order detention as applied to lawful permanent residents who had effected entry into the United States and later lost their admitted status.  See 533 U.S. at 682.  The Court emphasizes that its Due Process analysis rested on the petitioners' prior entry and presence in the United States, noting that "[o]nce an alien enters the country, the legal circumstance changes," because the Due Process Clause applies to all persons within the United States.  Zadvydas, 533 U.S. at 693. The Court acknowledges that "[a]liens who have not yet gained initial admission to this country would present a very different question." Zadvydas, 533 U.S. at 682.

The Supreme Court confronts that unaddressed question in Clark v. Martinez, 543 U.S. 371 (2005)("Clark").   In  Clark, the Supreme Court applies Zadvydas' statutory construction to inadmissible aliens whom the United States had never admitted.  Clark, 543 U.S. at 373.  Writing for the Court, Justice Scalia declines to rest the decision on Constitutional Due Process grounds. See Clark, 543 U.S. at 378.  Instead, he reasoned to "give these same words a different meaning for each category [of removable aliens] would be to invent a statute rather than interpret one." Clark, 543 U.S. at 378. Thus, Zadvydas' temporal limitation applies to inadmissible aliens as a matter of statutory interpretation, not because the Due Process Clause independently requires it.

avoidance canon, because "prolonged detention without adequate procedural protections' authorized by the provisions 'would raise serious constitutional concerns.'" Jennings, 583 U.S. at 289 (quoting Rodriguez v. Robbins, 804 F.3d 1060 (9th Cir. 2015), rev'd sub nom. Jennings, 583 U.S. 281). Justice Alito rejects the Ninth Circuit's use of the Constitutional avoidance canon, holding that the statutory text unambiguously authorizes detention until immigration officers finish considering asylum applications under § 1225(b)(1)(B)(ii) or until removal proceedings conclude under § 1225(b)(2)(A). See Jennings, 583 U.S. at 283. Section 1225(b)(1) and (b)(2) state that applicants for admission "shall be detained" pending asylum consideration or removal proceedings, and § 1226(c) similarly provides that the United States "shall" take into custody certain criminal aliens and release them from custody "only if" narrow statutory conditions are met. Jennings, 583 U.S. at 283. Because these provisions specify definite termination points and employ mandatory language, the Supreme Court concludes that the statutes are not susceptible to a reading that implicitly imposes periodic bond hearings. See 583 U.S. at 311-12.

In Jennings, the Supreme Court distinguishes Zadvydas, where the Supreme Court previously reads a reasonableness time limit into 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to avoid a Constitutional problem. See Jennings, 583 U.S. at 289-99. Justice Alito focuses on the discretionary language "may be detained" in § 1231(a), and the statute containing no explicit endpoint, creating ambiguity. Jennings, 583 U.S. at 299. By contrast, the detention provisions in § 1225 and § 1226 contain clear commands, and, with defined stopping points, leave no comparable textual uncertainty for the avoidance cannon to resolve. See Jennings, 583 U.S. at 300-01. Accordingly, the Supreme Court reverses the Ninth Circuit's judgment, and disagrees with the Ninth Circuit's statutory interpretation and remands the case for consideration of the detainee's Constitutional claims in the first instance, expressly declining to decide whether

prolonged detention under these provisions violates the Due Process Clause.  Jennings, 583 U.S. at 312.

The third recent Supreme Court cases analyzing due process and the INA is Thuraissigiam. In Thurissigiam, the Supreme Court considers whether 8 U.S.C. § 1252(e)(2)'s limits on review by federal courts of writ of habeas corpus violates either the Suspension Clause or the Due Process Clause.  See Thuraissigiam, 591 U.S. at 104.[20]  Respondent Vijayakumar Thuraissigiam is a Sri Lankan national that crosses the United States' border "without inspection or an entry document," and Border Patrol stops him "within 25 yards of the border."  Thuraissigiam, 591 U.S. at 114.  The United States detains him and places him in expedited removal proceedings under § 1225(b)(1). See Thuraissigiam, 591 U.S. at 114.  Thuraissigiam asserts a fear of returning to Sri Lanka and seeks asylum under § 1225(b)(1)(A)(ii).  See Thuraissigiam, 591 U.S. at 114.  The United States determines Thuraissigiam does not have a credible fear, and an immigration law judge affirms this determination, placing Thuraissigiam back into removal proceeding.  See Thuraissigiam, 591 U.S. at 114.

Thuraissigiam files a petition of a writ of habeas corpus challenging the credible fear determination, but the district court dismisses the petition, because § 1252(a)(2) and (e)(2) remove credible fear determinations from federal courts' jurisdiction under habeas petitions.  See

---

[20] "The Suspension Clause provides that '[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'"  Thuraissigiam, 591 U.S. at 116 (quoting U. S. Const., Art. I, § 9, cl. 2).  Because section 1252(e)(2) restricts judicial review in habeas proceedings to whether a petition is an alien, whether the United States orders the petitioner removed, or whether the petitioner can prove they some type of lawful permanent residence status, see 8 U.S.C. § 1252(e)(2)(A)-(C), the Ninth Circuit finds the provision violates Thuraissigiam's Constitutional rights.  See Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d at 1111, n.15.  The Supreme Court reverses the Ninth Circuit's decision, because respondent attempts use of the writ outside its historic role, which in this case is to have the United States make another credible fear determination.  See Thuraissigiam, 591 U.S. at 118.

Thuraissigiam, 591 U.S. at 115.  The Ninth Circuit reverses the district court, because the Ninth

Circuit concludes that "§ 1252(e)(2) violates the Suspension Clause." Thuraissigiam, 591 U.S. at

115.  The Ninth Circuit states "that respondent 'has procedural due process rights,' specifically the

right 'to expedited removal proceedings that conformed to the dictates of due process.'"

Thuraissigiam, 591 U.S. at 115 (quoting Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d

1097 (9th Cir. 2019), rev'd and remanded sub nom. Thuraissigiam, 591 U.S. 103).

      Justice Alito, writing for the Court, reverses the Ninth Circuit.  See Thuraissigiam, 591

U.S. at 140.  He first holds that § 1252(e)(2)'s limits on habeas review do not violate the

Suspension Clause because the writ, as historically understood at the time of the Founding, does

not extend to providing merits review of exclusion decisions.  See Thuraissigiam, 591 U.S. at 118.

Turning to due process, the Supreme Court explains that longstanding precedent draws a sharp

distinction between aliens who have effected entry and those who seek initial admission.  See

Thuraissigiam, 591 U.S. at 138-39.  The Supreme Court reiterates that the Constitution treats an

alien whom the United States has not admitted -- whether the United States physically stops them

at a port of entry, apprehends them shortly after unlawful entry, or paroles the alien into the country

for years -- is, "for due process purposes, as if stopped at the border." Thuraissigiam, 591 U.S. a

139.  In that posture, the alien "has only those rights regarding admission that Congress has

provided by statute." Thuraissigiam, 591 U.S. at 140. Because Congress specifies the procedures

governing credible-fear screening and judicial review of those determinations, the Due Process

Clause requires nothing more regarding Thuraissigiam's admission.  See Thuraissigiam, 591 U.S.

at 140.  The Supreme Court also emphasizes the structural consequences of adopting the Ninth

Circuit's approach.  See Thuraissigiam, 591 U.S. at 139 (stating the rule concerning the United

States' plenary power to admit or exclude aliens "would be meaningless if it became inoperative

as soon as an arriving alien set foot on U.S. soil").  The Supreme Court thus reaffirms that the

political branches retain plenary authority to define the procedures governing admission determinations and that courts may not Constitutionalize additional procedural entitlements in the statue.

Taken together, these cases delineate the Constitutional framework governing immigration detention and admission. Zadvydas establishes that, once an alien effects entry and establishes presence within the United States, indefinite civil detention raises serious due process concerns absent a realistic prospect of removal. See Zadyvdas, 533 U.S. at 690. Jennings clarifies that, where Congress clearly authorizes detention for defined immigration proceedings, courts may not rewrite statutes to impose extra-textual temporal limits, leaving the Constitutional questions -- whether the statute violates the Due Process Clause -- to be addressed directly. See Jennings, 583 U.S. at 311-12. Thuraissigiam confirms that aliens whom the United States has not admitted -- whether at the physical border or in the legal posture of as if at the border -- possess only those procedural rights regarding admission that Congress' written statutes provide. See Thuraissigiam, 591 U.S. at 139.

The distinction between territorial presence and effected entry doctrines resolves any tension among these lines of authority. Physical presence within the United States generally confers standing on aliens to invoke Constitutional protections, but the entry fiction permits Congress to treat certain physically present aliens like those awaiting inspection or paroled for admission processing as legally remaining at the threshold of entry. In that posture, procedural entitlements flow from statute rather than from the Due Process Clause.

## LAW REGARDING THE WRIT OF HABEAS CORPUS

Courts are most familiar with the writ of habeas corpus and its statutory authorization under 28 U.S.C. § 2241. Courts have less occasion to consider, however, habeas petitions that seek relief other than release from unlawful detention. Upon review of relevant case law, tension exists

between the Supreme Court's description of habeas as a flexible and "equitable remedy," <u>Schlup v. Delo</u>, 513 U.S. 298, 319 (1995), and the Supreme Court's more traditional understanding that courts generally do not use habeas to "order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody," <u>Wilkinson v. Dotson</u>, 544 U.S. 74, 86 (2005)(Scalia, J., concurring).  Resolving that tension requires careful attention to the historical development of the writ, its modern statutory framework, and the Constitutional principles that define its scope.  Accordingly, the Court examines: (i) the history of the writ at common law and under the federal habeas statutes, including the "finality era," <u>Thuraissigiam</u>, 591 U.S. at 120; and (ii) modern Supreme Court guidance on the scope of the writ, including its relationship to the Suspension Clause.  Gerald L. Neuman, <u>Habeas Corpus, Executive Detention, and the Removal of Aliens</u>, 98 Colum. L. Rev. 961, 1015 (1998)("Neuman").  Through this framework, the Court concludes that habeas is an "adaptable remedy," <u>Boumediene v. Bush</u>, 553 U.S. 723, 779 (2008)("<u>Boumediene</u>"), and, while historical practice informs the scope of habeas relief, it does not confine the writ to be used to release from custody in every instance; rather, in limited and extraordinary circumstances, habeas may afford relief "as law and justice require," 28 U.S.C. § 2243, consistent with its Constitutional function and historical purpose, <u>see Schneckloth v. Bustamonte</u>, 412 U.S. 218, 256 (1973)(Powell, J., concurring)("No one would now suggest that this Court be imprisoned by every particular of habeas corpus as it existed in the late 18th and 19th centuries.").

      **1.**      <u>**Habeas Corpus: The Great Wit**</u>**.**

The history of the writ of habeas corpus are "well-established."  Neuman at 970.[21]  "The writ originated in England as a vehicle for bringing a person before a court in order to facilitate

---

[21] <u>See</u>, <u>e.g.</u>, William F. Duker, <u>A Constitutional History of Habeas Corpus</u> 12-94 (1980); 9 W.S. Holdsworth, <u>A History of English Law</u> 104-25 (3d ed. 1944); Rollin C. Hurd, <u>A Treatise on</u>

proceedings in which his presence was required." Neuman at 970. The "Great Writ" evolved and achieves "its celebrity in the constitutional struggles" in the seventeenth century as a remedy against Political arrests by the King's council and minister." Neuman at 971. During this period, habeas affords that individuals the King arrests are not detained "on executive fiat rather than on legally recognized grounds . . . and that prisoners would not languish in pretrial detention when they should be bailed out." Neuman at 971. Accordingly, the writ of habeas corpus acquires an association with principle of due process that "individuals should be imprisoned only in accordance with the law of the land." Neuman at 971. "This understanding of due process includes both the guarantee of traditional procedures and the broader notion of the rule of law, that the grounds of detention must be provided by statute or common law." Neuman at 971. The framers of the United States Constitution enshrine the Great Writ in the Constitution stating: "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art I, § 9, cl. 2. See I.N.S. v. St. Cyr, 533 U.S. 289, 301 (2001)("St. Cyr")(stating that "the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789'" (quoting Felker v. Turpin, 518 U.S. 651, 663-64 (1996))). The Suspension Clause does not create the writ, but Chief Justice Marshall interprets the Constitution as obligating Congress to create "this great constitutional privilege." Neuman at 974.[22] Chief Justice Marshall concludes Congress creates the writ in the First Judiciary Act of 1789. See Neuman at 974.

---

the Right of Personal Liberty and on the Writ of Habeas Corpus and the Practice Connected With It: With a View of the Law of Extradition of Fugitives 73-104 (Albany, W.C. Little & Co. 1858); Daniel John Meador, Habeas Corpus and Magna Charta: Dualism of Power and Liberty 3-38 (1966); R.J. Sharpe, The Law of Habeas Corpus 1-19 (1976)(study from English and Commonwealth perspective).

[22] In Ex parte Bollman, 8 U.S. 75 (1807) Chief Justice Marshall states:

> Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege

a.    <u>**The Core of Habeas Petitions, Remedying Unlawful Detention**</u>.

The writ of habeas corpus has long functioned as a judicial mechanism for testing the lawfulness of detention.[23]  From its origins in English common law through its development in American jurisprudence, habeas serves as a means by which courts inquire into whether the United States has lawful authority to restrain an individual's liberty.[24]  Historical practice does not confine

---

itself would be lost, although no law for its suspension should be enacted.  Under the impression of this obligation, they give, to all the courts, the power of awarding writs of habeas corpus.

8 U.S. at 95.  Justice Scalia embraces <u>Ex parte Bollman</u> for the proposition that the Suspension Clause does not have effect without legislation and that history provides context as to what right the Suspension Clause enshrines.  <u>See</u> <u>St. Cyr</u>, 533 U.S. at 340-41 (Scalia, J., dissenting)(stating that there "no more reason for us to believe, than there was for the Marshall Court to believe, that the Suspension Clause means anything other than what it says" (referring to <u>Ex parte Bollman</u>, 8 U.S. at 95)).

[23] There is a historical debate whether State courts possess authority to issue writs of habeas corpus directing the release of federal prisoners.  <u>See</u> Neuman at 974.  Neuman ultimately concludes that historical practice does not support the view that the Suspension Clause preserves state judicial power over federal detention.  <u>See</u> Neuman at 975 ("I will not pursue the hypothesis that the Suspension Clause was intended to preserve state judicial power over federal detention and has been systematically violated for over a century.").  A related historical caution bears emphasis: the standards governing the writ's issuance as a safeguard against unlawful executive detention differ from the doctrinal standards governing habeas as a form of postconviction collateral review.  <u>See</u> Neuman at 962 ("They are conflating the standards for the issuance of the writ as a remedy for unlawful executive detention with the standards for its use as a means of postconviction relief.").  Conflating these distinct historical functions risks obscuring the evolution of habeas jurisprudence in different procedural contexts.

[24] Neuman notes that the 1789 Judiciary Act does not define the "standards" for habeas relief, but Chief Justice Marshall describes the standards as those known to common law.  Neuman at 981-82.  Furthermore, in <u>Ex parte Watkins</u>, 28 U.S. 193 (1830), Chief Justice Marshall describes the writ:

The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment.  The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ when issued was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial.  To remedy this evil

the concept of "lawfulness," however, to a single category of legal defect.  Neuman at 984 n.126 (discussing the shift of habeas petitions from "isolated constitutional violations by individual officers or judges" to "the constitutionality of statutes").  Historically, petitioners invoke habeas to challenge detention on multiple grounds, including: (i) allegations that the custodian acts without statutory authority, see Ex parte D'Olivera, 7 F. Cas. 853 (C.C.D. Mass. 1813)(holding that a justice of the peace detains deserting sailors "without color of jurisdiction," because neither the common law nor a statute authorizes detainment); see also Thuraissigiam, 591 U.S. at 172 (Sotomayor, J., dissenting); (ii) allegations that an act of Congress is unconstitutional, see Ex parte Siebold, 100 U.S. 371, 374 (1879)("The question is whether a party imprisoned . . . upon conviction of a crime created by and indictable under an unconstitutional act of Congress, maya be discharged on . . . on habeas corpus."); or (iii) that the conditions or consequences of confinement rendered continued detainment unlawful, see Johnson v. Avery, 393 U.S. 483, 485 (1969)(acceptation a petitioner's "motion for law books and a typewriter" as a petition for a writ of habeas corpus, before invaliding prison regulations).  Thus, habeas operates as an adaptable and equitable vehicle through which detained individuals may test the legality of their restraint.  Although the historical inquiry into lawfulness takes varied forms, the traditional remedy associated with habeas remains comparatively focused: release from custody, accelerated release, or relief directly affecting the fact or duration of confinement.  See Preiser v. Rodriguez, 411 U.S. 475, 498 (1973)("But none of the state prisoners in those cases was challenging the fact or duration

---

the celebrated habeas corpus act of the 31st of Charles II. was enacted, for the purpose of securing the benefits for which the writ was given.  This statute may be referred to as describing the cases in which relief is, in England, afforded by this writ to a person detained in custody.  It enforces the common law.

Ex parte Watkins, 28 U.S. at 202.

of his physical confinement itself, and one was seeking immediate release or a speedier release from that confinement -- the heart of habeas corpus.").

    **b.**    **The Finality Era.**

The "finality era" reveals the breadth of the Great Writ and the durability of the lawfulness inquiry. The body of case law following the Immigration Act of 1891 represents the "finality era," because, during this period, Congress makes "certain immigration decisions 'final.'" Thuraissigiam, 591 U.S. at 128. See Neuman at 1008 ("Dissatisfaction with the courts' performance led to congressional efforts to confer finality on the decisions of the executive officials."). The 1891 provision contains sweeping language stating: "'All decisions made by the inspection officers or their assistants toughing the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Neuman at 1008 (quoting Act of March 3, 1891, ch. 551, § 8, 26 Stat. 1084, 1085). In Nishimura Ekiu v. United States, 142 U.S. 651 (1892)("Nishimura"), the Supreme Court upholds the provisions, while preserving the writ of habeas corpus "to ascertain whether the restrain is lawful." 142 U.S. at 660. Thereafter, courts begin to give immigration officers "findings of fact" conclusiveness while assuring that the "procedures set out in the 1891 act had been followed." Thuraissigiam, 591 U.S. at 131-33. See Neuman at 1010 (stating the Supreme "Court went on to confirm that the immigration statutes did authorize the exclusion of person likely to become a public charge, that the inspector had been properly appointed, and that the procedures followed were in accordance with the statute").

Justice Gray, in Nishimura, pronounces the often-quoted statement that "the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law." 142 U.S. at 661. See Thuraissigiam, 591 U.S. at 130 (quoting Nishimura); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)("Mezei"). As early as 1903,

however, the Supreme Court begins to question that pronouncement.  See Yamataya v. Fisher, 189 U.S. 86, 100-01 (1903)("But this court has never held . . . that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law.'").  The writ of habeas corpus is the vehicle by which due process reemerges in exclusion and deportation detention.  See Kwock Jan Fat v. White, 253 U.S. 454, 464 (1920)(finding due process violation in officer's omission of favorable evidence from record for administrative appeal).  For example, in Chin Yow v. United States, 208 U.S. 8 (1908), the Supreme Court observes that, as between "persons alleging themselves to be citizens . . . on one side, and the conclusiveness of the commissioner's fiat, on the other, when one or the other must give way, the latter must yield."  208 U.S. at 12.  Moreover, the Supreme Court continues, stating that the United States cannot imprison an alien at the border "without the process of law to which is given a right."  Chin Yow v. United States, 208 U.S. at 13.  See Thuraissigiam, 591 U.S. at 156 (Breyer, J., concurring)(noting that throughout the "finality era," the Supreme Court address procedural claims "that fundamentally under mined the efficacy of the process prescribed by law").  Although the Court reads the historical jurisprudence as confirming that the petitioners traditionally invoke habeas to challenge unlawful detention on both factual and procedural grounds -- even where Congress narrowly circumscribes review -- the Court must address Mezei and the United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)("Knauff"), which continue to shape the modern understanding of when aliens may invoke the Great Writ to assert due process rights.

Knauff involves an alien challenging her exclusion detention, without due process, through a habeas petition.  See 338 U.S. at 539.  Congress authorizes the Attorney General to order "the exclusion of aliens without a hearing."  Knauff, 338 U.S. at 540 (citing 22 U.S.C. § 223).  The petitioner argues that Congress' authorization is unconstitutional and, furthermore, that the

regulations the Attorney General creates from Congress' act are also unconstitutional.  See Knauf, 338 U.S. at 542 ("Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power.").  The Supreme Court rejects the argument that the statute is unconstitutional, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power.  It is implementing an inherent executive power," and, consequentially, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."  Knauff, 338 U.S. at 542-44.  Although the Supreme Court does not entertain the petitioner's challenge to Congressional authority, it scrutinizes whether the Attorney General's regulations are within the authority Congress grants.  Knauff, 338 U.S. at 544 ("We find no substantial merit to petitioner's contention that the regulations were not 'reasonable' as they were required to be by the 1941 Act.").  What emerges from the Supreme Court's analysis is a doctrinal asymmetry.  While historical jurisprudence forecloses an excludable alien from invoking the Due Process Clause to challenge Congress' legislative choices, the same alien nevertheless may invoke habeas corpus to test the Executives's implementation of those choices.  This tension invites closer examination.  Before addressing the asymmetry, the Court turns to Mezei, which is understood as extending Knauff, for further insight.  See Neuman at 1017 ("In Mezei, the Majority extended Knauff.").

In Mezei, the Supreme Court considers whether the United States may detain for exclusion an alien indefinitely, because no country will accept him.  See 345 U.S. at 207.  The facts are remarkably different from Knauff, because of the potential length of detention, and because the respondent lives in the United States for decades before the United States detains him while he attempts to reenter the country.  See Mezei, 345 U.S. at 213 ("Neither respondent's harborage on Ellis Island nor his prior residence here transforms this into something other an exclusion

proceeding."). As to the length of detention, Justice Clark concludes that the "continued exclusion [does not] deprive him of any statutory or constitutional right," and, moreover, "an alien in respondent's position is no more ours than theirs." Mezei, 345 U.S. at 215-16. Regarding the time respondent spends in the United States, the Supreme Court sees no distinction between him and arriving aliens, because the respondent "simply left the United States and remained behind the Iron Curtain for 19 months." Mezei, 345 U.S. at 214. Accordingly, the Due Process Clause tolerates exclusion proceedings rather than deportation proceedings.

Now that the Court considers Mezei, it returns to the doctrinal asymmetry the Court observes in Knauff with respect to how the Supreme Court treats the statute and regulations. Even where the Supreme Court declines to permit direct due process challenges to Congress' legislative judgments concerning arriving aliens, it nevertheless allows the writ of habeas corpus to function as a vehicle for testing the lawfulness of Executive implementation. See Knauff, 338 U.S. at 542-44. The Due Process Clause requires no more process than Congress elects to provide at the border, yet habeas persists -- even in its most constrained form -- as a means for detainees to assert that the Executive exceeds the authority Congress confers. For that reason, the Supreme Court tests whether the regulations in Knauff are reasonable. In areas of policy where Congress vests the Executive with discretion over factual determinations, judicial review is correspondingly limited, with courts intervening only when the Constitution mandates oversight, such as arbitrary or capricious determinations. Mezei illustrates that limitation, because the Supreme Court recognizes the issues of national security in the midst of the Cold War. Osorio-Martinez v. Att'y Gen. United States of Am., 893 F.3d 153, 174 (3d Cir. 2018)("Osorio-Martinez")(stating that "this case stands in stark contrast to the key precedents we relied on in Castro [Knauff and Mezei]-- two Cold War-era decisions about aliens detained on Ellis Island at the threshold of entry"). For questions of law, however, the Supreme Court preserves habeas as a mechanism through which

the judiciary fulfills its Constitutional duty to say what the law is.  See St. Cyr, 533 U.S. at 304-05 ("In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus.").  Read together, these decisions indicates that habeas review functions less as a vehicle for expanding individual rights in this context than as a structural safeguard ensuring that Executive detention remains subject to judicial determination of legal authority.  Regardless of the level of deference afforded to the political branches or the factual postures of the case, the Great Writ endures as a safeguard against unchecked governmental detention.

That the Great Writ endures is without dispute.  The Court now turns to the more difficult question -- whether habeas retains the contours that the Framers enshrine in the Suspension Clause and that the Judiciary Act of 1789 codifies.

## 2.    The Writ of Habeas Corpus Modern Parameters.

The Supreme Court "has been careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope of the writ."  Boumediene, 553 U.S. at 746.  See Thuraissigiam, 591 U.S. at 152 (Breyer, J., concurring)("Habeas corpus, as we have said, is an 'adaptable remedy,' and the 'precise application and scope' of the review it guarantees may change 'depending upon the circumstances.'" (quoting Boumediene, 553 U.S. at 779; see id., at 813 (Roberts, C.J., dissenting))).  Indeed, the Supreme Court goes to great lengths to avoid answering what the writ's scope is under the modern habeas statute.  See Thurissigiam, 591 U.S. at 126 ("But respondent does not ask us to hold that the Suspension Clause guarantees the writ as it might have evolved since the adoption of the Constitution.  On the contrary, as noted at the outset of this discussion,

he rests his argument on 'the writ as it existed in 1789.'" (quoting Brief for Respondent 26, n.12.));

Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979)("Thus, we leave to another day the question of the

propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as

distinct from the fact or length of the confinement itself."); Preiser v. Rodriguez, 411 U.S. at 499

("But we need not in this case explore the appropriate limits of habeas corpus as an alternative

remedy to a proper action under § 1983.  That question is not before us.").  What remains clear,

notwithstanding its doctrinal evolution, is that habeas corpus continues to reflect its historical core.

## ANALYSIS

The Court carefully reviews the PFRD and the relevant pleadings.  In the PFRD, Magistrate

Judge Robbenhaar recommends that the Court make four conclusions.  First, Magistrate Judge

Robbenhaar recommends that the Court conclude that Loza and Castillo's removal proceedings

should not be enjoined during their challenge to their continued detention pursuant to Sections

1225 and 1226, although the Court should not conclude that the petition is moot until the time to

appeal the removal order has expired, or if a timely appeal is filed, until the BIA issues a decision

on that appeal.  See PFRD at 11.  Second, Magistrate Judge Robbenhaar recommends that the

Court conclude that Loza and Castillo cannot be properly detained under § 1225(b)(2), but instead

must be detained under § 1226(a) and either released -- Castillo -- or granted a bond hearing --

Loza.  See PFRD at 13, 19.  Third, Magistrate Judge Robbenhaar recommends that the Court

conclude that the burden at the bond hearing shift to the United States to prove by clear-and-

convincing evidence that petitioner is a flight risk or danger to the community in order to deny

bond.  See PFRD at 24.  Finally, Magistrate Judge Robbenhaar recommends that the Court

conclude that, pursuant to the All Writs Act, it will enter an injunction preventing Loza and

Castillo's removal from the United States and/or transfer from the District of New Mexico during

the pendency of these habeas proceedings.  See PFRD at 24.  Based on these recommendations,

he recommends that: (i) the Court grant Petitioners' Amended Motion for Temporary Restraining Order, filed November 6, 2025 (Doc. 5)("TRO") in part and deny it in part; (ii) the Court deny the request for enjoining the removal proceedings of Loza and Castillo without prejudice; (iii) Loza should be granted a bond hearing, at which the United States bears the burden of proof by clear-and-convincing evidence, and if Loza is not afforded a bond hearing within seven days of the Court order, Loza should be released; (iv) Castillo should be released with no additional requirements other than the bond conditions previously ordered by the IJ; and (v) the request to prohibit Respondents from transferring Loza and Castillo out of the District of New Mexico and the United States should be granted pursuant to the All Writs Act.  See PFRD at 26.  Pursuant to rule 72(b) of the Federal Rules of Civil Procedure, the Court conducts a de novo review of the record and all parts of the Magistrate Judge Robbenhaar's PFRD to which the Federal Respondents properly object.  The Federal Respondents object to (i) the recommendation that § 1226 applies to Petitioners' detention, instead of § 1225(b)(2); (ii) the recommendation that Petitioners' due process rights are violated because of detention under § 1225(b)(2) instead of § 1226; (iii) the recommendation for burden shifting at future bond review hearings; (iv) the recommendation for relief not sought by Petitioners in their TRO -- ordering compliance with the due process protections to which Petitioners are entitled; (v) the recommendation to enjoin removal from the United States; and (v) the characterization of its discretionary stay request.  See Objections at 2, 11, 13-14.  After conducting this de novo review, the Court concludes that there are sound reasons in the applicable law and the relevant facts to overrule some and sustain some of the Objections to Magistrate Judge Robbenhaar's PFRD and accordingly the Court adopts some of the PFRD's recommendations and declines to adopt other parts of the PFRD.

I.    **THE COURT OVERRULES THE FEDERAL RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE ROBBENHAAR'S CONCLUSION IN THE PFRD THAT 8 U.S.C. § 1226(a) GOVERNS PETITIONERS' DETENTION.**[25]

The Federal Respondents argue that the Petitioners are subject to mandatory detention under § 1225(b)(2), because they are aliens present in the United States without the United States admitting the Petitioners lawfully into the United States, and that, therefore, the Court should not grant the Petitioners either immediate release or a bond hearing. See Objections at 8. The Court concludes that the Federal Respondents are incorrect in concluding that they can hold either Loza or Castillo under § 1225(b)(2). While Loza and Castillo are applicants for admission, they are not seeking admission such that § 1225(b)(2) applies, and because they do not fall under § 1225's scope, the United States must detain them under § 1226(a), and grant them whatever process the statute affords them.

The relevant language of 8 U.S.C. § 1225(b)(2) states:

(A)    In General

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229(a) of this title.

(B)    Exception - Subparagraph A shall not apply to an alien –

(i)    who is a crewman

(ii)    to whom paragraph (1) applies, or

(iii)    who is a stowaway.

8 U.S.C. § 1225(b)(2). Section 1225(b)(2) applies only to aliens who are applicants for admission -- "an alien present in the United States who has not been admitted or who arrives in the United

---

[25] The Court does not, however, order any relief consistent with this ruling, because the Court sustains a later Objection in which the Federal Respondents object to the granting of relief beyond the scope of the Petitioners' TRO filings. See infra Section IV.

States" -- who seek admission, and do not fall within § 1225(b)(1)'s scope.  8 U.S.C. § 1225(a)(1).

Section 1225(b)(2) does not cover an alien who is an applicant for admission, and who is present

in the United States for more than two consecutive years without any application that indicates the

alien is actively seeking admission; the United States instead must detain those whom § 1225(b)(1)

and § 1225(b)(2) does not cover under § 1226(a).

### A.  LOZA IS NOT SEEKING ADMISSION SUCH THAT HE CAN BE DETAINED UNDER § 1225(b)(2), AND ACCORDINGLY MUST BE DETAINED UNDER § 1226(a).

Loza is a Mexican citizen and national who first arrives in the United States without

inspection around August, 1999.  See PFRD at 4.  On August 16, 2025, Loza is "'detained at a

check point located in the interior of the United States.'"  PFRD at 4 (quoting Class Action

Complaint and Petition for Writ of Habeas Corpus, ¶ 52, at 16, filed October 29, 2025

(Doc.1)("Class Action Complaint").  Loza is an applicant for admission, because he is an alien

present in the United States without admission.  See § 1225(a)(1)("An alien present in the United

States who has not been admitted or who arrives in the United States . . . shall be deemed for the

purposes of this chapter an applicant for admission").  The Court therefore looks first to whether

the United States may properly detain Loza under § 1225(b)(1).  The Court determines that the

United States may not detain Loza under § 1225(b)(1), because he is not an arriving alien and is

not an alien present in the United States continuously for less than two years whom an immigration

officer has deemed inadmissible under §§ 1182(a)(6)(C), (a)(7).  Accordingly, the Court next looks

to whether the United States may detain Loza under § 1225(b)(2).  The United States does not

apprehend Loza at the United States border, but instead at a border checkpoint in the country's

interior.  See PFRD at 4.  There is no indication that Loza has any pending application which

indicates that he is seeking admission.  The only way, therefore, that Loza can be subject to

mandatory detention under § 1225(b)(2) is if the interior checkpoint at which he is detained is

treated as the border, such that the law considers Loza to be seeking admission by entering the checkpoint.[26]

---

[26] While the Court need not decide the issue for purposes of this case, and given the habeas petitions that the federal courts are seeing right now, the courts may never need to decide the issue, but the Court comments on the issue whether an alien, merely by showing up at the airport or border check point, is "an alien seeking admission" for purposes of being an "other alien" in § 1225(b)(2). At first glance, a lay reading suggests that an alien coming through a checkpoint is "an alien seeking admission." 8 U.S.C. § 1225(b)(2). A closer reading of the statute's words suggest otherwise.

An applicant for admission includes an "alien who arrives in the United States . . . at a designated port of arrival." 8 U.S.C. § 1225(a)(1). Section 1225(a)(3) states that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission . . . shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). Presumably what the immigration officers are inspecting is paperwork. Section 1225(a)(3) suggests that "applicants for admission" and aliens who are "otherwise seeking admission" are different groups. 8 U.S.C. §1225(a)(3). Congress uses a phrase similar to "seeking admission" in § 1225(a) when it talks about "application for admission," "applying for admission," and "withdraw the application for admission." 8 U.S.C. 1225(a)(4). "Applications" and "applying" and "withdraw the application" sound like they involve paperwork. 8 U.S.C. § 1225(a)(4). Section 1225(a)(5) talks about "statements" being under oath when an applicant for admission is providing information "of the applicant in seeking admission." 8 U.S.C. § 1225(a)(5). Again, that appears to involve paperwork. Hence, when § 1225(b)(2) uses the phrase "the examining immigration officer determines that an alien seeking admission," 8 U.S.C. 1225(b)(2), the phrase suggests that the examining officers are reviewing paper and not meeting "an alien . . . who is arriving." 8 U.S.C. § 1225(b)(1)(i).

There are other reasons why an alien "seeking admission," is not the same as an alien "arriving in the United States." 8 USC § 1225(b)(2). Section 1225(b)(1) covers "Inspection of aliens arriving in the United States," and § 1225(b)(1) deals with screening of, among other aliens, "an alien . . . who is arriving in the United States." 8 U.S.C. § 1225(b)(1). Section 1225(b)(1) authorizes immigration officers to conduct expedited removal for specified categories of arriving aliens whom the officers determine to be inadmissible for reasons including fraud or misrepresentation, see 8 U.S.C. § 1182(a)(6)(C), or a lack of valid entry documents, see 8 U.S.C. § 1182(a)(7). Section 1182(a) has eight other reasons for inadmissibility, and all aliens inadmissible for those reasons are subject to normal removal under § 1225(b)(2). The ten inadmissibility provisions are:

    (a)    Classes of aliens ineligible for visas or admission

          Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

    (1)  Health-related grounds

      (A)    In general

            Any alien--

        (i)    who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance;[1]

(ii)     except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

(iii)    who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)--

(I)    to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

(II)    to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

(iv)    who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,is inadmissible.

(B)    Waiver authorized

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

(C)    Exception from immunization requirement for adopted children 10 years of age or younger Clause (ii) of subparagraph (A) shall not apply to a child who--

(i)    is 10 years of age or younger,

(ii)    is described in subparagraph (F) or (G) of section 1101(b)(1) of this title;[1] and

(iii)    is seeking an immigrant visa as an immediate relative under section 1151(b) of this title, if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

(2)   Criminal and related grounds

(A)    Conviction of certain crimes

(i)    In general

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

(I)    a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(II)    a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible.

(ii)    Exception

Clause (i)(I) shall not apply to an alien who committed only one crime if--

(I)    the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II)    the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

(B)    Multiple criminal convictions

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

(C)    Controlled substance traffickers

Any alien who the consular officer or the Attorney General knows or has reason to believe--

(i)    is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

(ii)    is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

(D)    Prostitution and commercialized vice

Any alien who--

(i)    is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

(ii)    directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the

purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

(iii)    is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution, is inadmissible.

(E)    Certain aliens involved in serious criminal activity who have asserted immunity from prosecution

Any alien--

(i)    who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

(ii)    for whom immunity from criminal jurisdiction was exercised with respect to that offense,

(iii)    who as a consequence of the offense and exercise of immunity has departed from the United States, and

(iv)    who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense, is inadmissible.

(F)    Waiver authorized

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

(G)    Foreign government officials who have committed particularly severe violations of religious freedom

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of Title 22, is inadmissible.

(H)    Significant traffickers in persons

(i)    In general

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 7102 of Title 22, is inadmissible.

(ii)    Beneficiaries of trafficking

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

(iii)    Exception for certain sons and daughters

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

(I)    Money laundering

Any alien--

      (i)       who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of Title 18 (relating to laundering of monetary instruments); or

      (ii)     who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section; is inadmissible.

  (3)      Security and related grounds

  (A)     In general

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in--

      (i)       any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

      (ii)     any other unlawful activity, or

     (iii)    any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means, is inadmissible.

  (B)     Terrorist activities

    (i)      In general

Any alien who--

     (I)      has engaged in a terrorist activity;

    (II)     a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

   (III)    has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

   (IV)    is a representative (as defined in clause (v)) of--

     (aa)      a terrorist organization (as defined in clause (vi)); or

     (bb)      a political, social, or other group that endorses or espouses terrorist activity;

    (V)     is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

    (VI)    is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

  (VII)    endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

 (VIII)  has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

    (IX)    is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible

- 83 -

occurred within the last 5 years, is inadmissible.  An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

(ii)      Exception

Subclause (IX) of clause (i) does not apply to a spouse or child--

(I)    who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

(II)    whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

(iii)     "Terrorist activity" defined

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I)    The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II)    The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III)    A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

(IV)    An assassination.

(V)    The use of any--

(a)    biological agent, chemical agent, or nuclear weapon or device, or

(b)    explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI)    A threat, attempt, or conspiracy to do any of the foregoing.

(iv)    "Engage in terrorist activity" defined

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

(I)    to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

(II)    to prepare or plan a terrorist activity;

(III)    to gather information on potential targets for terrorist activity;

(IV)    to solicit funds or other things of value for--

(aa)    a terrorist activity;

(bb)    a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc)    a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he

did not know, and should not reasonably have known, that the organization was a terrorist organization;

(V)   to solicit any individual--

   (aa)   to engage in conduct otherwise described in this subsection;

   (bb)   for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

   (cc)   for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

(VI)   to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

   (aa)   for the commission of a terrorist activity;

   (bb)   to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

   (cc)   to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

   (dd)   to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

(v)   "Representative" defined

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

(vi)   "Terrorist organization" defined

As used in this section, the term "terrorist organization" means an organization--

(I)   designated under section 1189 of this title;

(II)   otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

(III)   that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

(C)Foreign policy

(i)   In general

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially

serious adverse foreign policy consequences for the United States is inadmissible.

(ii)    Exception for officials

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

(iii)    Exception for other aliens

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

(iv)    Notification of determinations

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

(D)    Immigrant membership in totalitarian party

(i)    In general

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

(ii)    Exception for involuntary membership

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

(iii)    Exception for past membership

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that--

(I)    the membership or affiliation terminated at least--

(a)    2 years before the date of such application, or

(b) 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

(II) the alien is not a threat to the security of the United States.

(iv) Exception for close family members

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

(E) Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing

(i) Participation in Nazi persecutions

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with--

(I) the Nazi government of Germany,

(II) any government in any area occupied by the military forces of the Nazi government of Germany,

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

(ii) Participation in genocide

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of Title 18, is inadmissible.

(iii) Commission of acts of torture or extrajudicial killings

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of--

(I) any act of torture, as defined in section 2340 of Title 18; or

(II) under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note), is inadmissible.

(F) Association with terrorist organizations

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

(G) Recruitment or use of child soldiers

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is inadmissible.

(4)   Public charge

(A)        In general

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

(B)        Factors to be taken into account

(i)        In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's--

(I)        age;

(II)       health;

(III)      family status;

(IV)      assets, resources, and financial status; and

(V)       education and skills.

(ii)       In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph.

(C)        Family-sponsored immigrants

Any alien who seeks admission or adjustment of status under a visa number issued under section 1151(b)(2) or 1153(a) of this title is inadmissible under this paragraph unless--

(i)        the alien has obtained--

(I)        status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 1154(a)(1)(A) of this title;

(II)       classification pursuant to clause (ii) or (iii) of section 1154(a)(1)(B) of this title; or

(III)      classification or status as a VAWA self-petitioner; or

(ii)       the person petitioning for the alien's admission (and any additional sponsor required under section 1183a(f) of this title or any alternative sponsor permitted under paragraph (5)(B) of such section) has executed an affidavit of support described in section 1183a of this title with respect to such alien.

(D)        Certain employment-based immigrants

Any alien who seeks admission or adjustment of status under a visa number issued under section 1153(b) of this title by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible under this paragraph unless such relative has executed an affidavit of support described in section 1183a of this title with respect to such alien.

(E) Special rule for qualified alien victims

Subparagraphs (A), (B), and (C) shall not apply to an alien who--

(i)        is a VAWA self-petitioner;

(ii)       is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U) of this title; or

(iii)      is a qualified alien described in section 1641(c) of this title.

(5)   Labor certification and qualifications for certain immigrants

(A)      Labor certification

(i)      In general

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--

(I)      there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

(II)      the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

(ii)      Certain aliens subject to special rule

For purposes of clause (i)(I), an alien described in this clause is an alien who--

(I)      is a member of the teaching profession, or

(II)      has exceptional ability in the sciences or the arts.

(iii)      Professional athletes

(I)      In general

A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

(II)      "Professional athlete" defined

For purposes of subclause (I), the term "professional athlete" means an individual who is employed as an athlete by--

(aa)      a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

(bb)      any minor league team that is affiliated with such an association.

(iv)      Long delayed adjustment applicants

A certification made under clause (i) with respect to an individual whose petition is covered by section 1154(j) of this title shall remain valid with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued.

(B)      Unqualified physicians

An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession is inadmissible, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and

Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

(C)     Uncertified foreign health-care workers

Subject to subsection (r), any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that--

    (i)     the alien's education, training, license, and experience--

      (I)     meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

      (II)     are comparable with that required for an American health-care worker of the same type; and

      (III)     are authentic and, in the case of a license, unencumbered;

    (ii)     the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

    (iii)     if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination. For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.

(D)     Application of grounds

The grounds for inadmissibility of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph (2) or (3) of section 1153(b) of this title.

(6)    Illegal entrants and immigration violators

(A)     Aliens present without admission or parole

    (i)     In general

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

    (ii)     Exception for certain battered women and children

Clause (i) shall not apply to an alien who demonstrates that--

<table>
<tr><td>(I)</td><td>the alien is a VAWA self-petitioner;</td></tr>
</table>

(I)    the alien is a VAWA self-petitioner;

(II)   (a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

(III)  there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

(B)    Failure to attend removal proceeding

Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.

(C)    Misrepresentation

(i)    In general

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

(ii)   Falsely claiming citizenship

(I)    In general

Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

(II)   Exception

In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

(iii)  Waiver authorized

For provision authorizing waiver of clause (i), see subsection (i).

(D)    Stowaways

Any alien who is a stowaway is inadmissible.

(E)    Smugglers

(i)    In general

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.

(ii) Special rule in the case of family reunification

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

(iii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(11).

(F) Subject of civil penalty

(i) In general

An alien who is the subject of a final order for violation of section 1324c of this title is inadmissible.

(ii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(12).

(G) Student visa abusers

An alien who obtains the status of a nonimmigrant under section 1101(a)(15)(F)(i) of this title and who violates a term or condition of such status under section 1184(l) of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.

(7) Documentation requirements

(A) Immigrants

(i) In general

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission--

(I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

(II) whose visa has been issued without compliance with the provisions of section 1153 of this title, is inadmissible.

(ii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (k).

(B) Nonimmigrants

(i) In general

Any nonimmigrant who--

    (I)    is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

    (II)    is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission, is inadmissible.

  (ii)    General waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(4).

  (iii)    Guam and Northern Mariana Islands visa waiver

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (l).

  (iv)    Visa waiver program

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

(8)    Ineligible for citizenship

  (A)    In general

Any immigrant who is permanently ineligible to citizenship is inadmissible.

  (B)    Draft evaders

Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency is inadmissible, except that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

(9)    Aliens previously removed

  (A)    Certain aliens previously removed

  (i)    Arriving aliens

Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

  (ii)    Other aliens

Any alien not described in clause (i) who--

    (I)    has been ordered removed under section 1229a of this title or any other provision of law, or

    (II)    departed the United States while an order of removal was outstanding, and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

  (iii)    Exception

Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the

United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

(B) Aliens unlawfully present

 (i) In general

  Any alien (other than an alien lawfully admitted for permanent residence) who--

  (I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e)[2] of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

  (II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible.

 (ii) Construction of unlawful presence

  For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

 (iii) Exceptions

  (I) Minors

  No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

  (II) Asylees

  No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

  (III) Family unity

  No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

  (IV) Battered women and children

  Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if "violation of the terms of the alien's nonimmigrant visa" were substituted for "unlawful entry into the United States" in subclause (III) of that paragraph.

  (V) Victims of a severe form of trafficking in persons

  Clause (i) shall not apply to an alien who demonstrates that the severe form of trafficking (as that term is defined in section 7102 of Title 22) was at least one central reason for the alien's unlawful presence in the United States.

 (iv) Tolling for good cause

In the case of an alien who--

- (I) has been lawfully admitted or paroled into the United States,
- (II) has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and
- (III) has not been employed without authorization in the United States before or during the pendency of such application, the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

(v) Waiver

The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien.  No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

(C) Aliens unlawfully present after previous immigration violations

(i) In general

Any alien who--

- (I) has been unlawfully present in the United States for an aggregate period of more than 1 year, or
- (II) has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law, and who enters or attempts to reenter the United States without being admitted is inadmissible.

(ii) Exception

Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

(iii) Waiver

The Secretary of Homeland Security may waive the application of clause (i) in the case of an alien who is a VAWA self-petitioner if there is a connection between--

- (I) the alien's battering or subjection to extreme cruelty; and
- (II) the alien's removal, departure from the United States, reentry or reentries into the United States; or attempted reentry into the United States.

(10) Miscellaneous

(A) Practicing polygamists

Any immigrant who is coming to the United States to practice polygamy is inadmissible.

(B) Guardian required to accompany helpless alien

Any alien--

(i)      who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 1222(c) of this title, and

(ii)      whose protection or guardianship is determined to be required by the alien described in clause (i), is inadmissible.

(C)      International child abduction

(i)      In general

Except as provided in clause (ii), any alien who, after entry of an order by a court in the United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, is inadmissible until the child is surrendered to the person granted custody by that order.

(ii)      Aliens supporting abductors and relatives of abductors

Any alien who--

(I)      is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

(II)      is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

(III)      is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

(iii)      Exceptions

Clauses (i) and (ii) shall not apply--

(I)      to a government official of the United States who is acting within the scope of his or her official duties;

(II)      to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

(III)      so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

(D)      Unlawful voters

(i)      In general

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible.

(ii)      Exception

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the

In the Fourth Amendment to the Constitution of the United States context, the Supreme Court recognizes in dicta that certain interior checkpoints are "functional equivalents" to border checkpoints, such that the Fourth Amendment protections against searches are lower than they otherwise are in the United States' interior.  See Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973)("Whatever the permissible scope of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional

---

United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such violation.

(E)     Former citizens who renounced citizenship to avoid taxation
Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is inadmissible.

8 U.S.C. §§ 1182(a)(1)-(5), (a)(8)-(10).  These provisions are unlikely to be applicable at a border or airport check point.  These are paper mistakes that are unlikely to be committed at the border or a "checkpoint."  Thus, "aliens seeking admission" are not the same as "an alien . . . who is arriving in the United States."  8 U.S.C. § 1225(b)(2).

If an alien "arriving in the United States" is inadmissible under §§ 1182(a)(6)(C) or 1182(a)(7), the alien is subject to expedited removal.  Given the other eight provisions in § 1182 do not relate to arriving, saying "aliens seeking admission" is the same as "an arriving" alien does not match the reality and the statute's language.

The reasons that some try to equate "arriving" with "seeking admission" is that they both sound like "entry."  In the IIRIRA, Congress drops the concept of "entry" from the INA and replaces entry with a definition of who is an applicant for admission.  Kurzbam, supra, at 73.  By eliminating the definition of "entry," and replacing "entry" with the terms "admission" and "admitted," Congress "re-characterize[s] aliens who are present in the United States, but who have not been inspected and admitted" as "applicants for admission."  Succar, 394 F.3d at 13.  Congress defines admission as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).

If an alien "arriving in the United States" falls within § 1225(b)(1), § 1225(b)(2) cannot cover them.  See 8 U.S.C. § 1225(b)(2)(B)(ii) ("Except subparagraph (A) shall not apply to an alien -- . . . (ii) to whom paragraph (1) applies . . . .").  Thus, while applicants for admission includes arriving aliens, § 1225(b)(2)(B)(ii) covers most if not all of them.  Thus, "seeking admission" requires more than just presentation at a border or a checkpoint.

equivalent as well."). Examples of the functional equivalent of border checkpoints include "searches at an established station near the border," or "at a point marking the confluence of two or more roads extending from the border." Almeida-Sanchez v. United States, 413 U.S. at 273. Not all permanent checkpoints, however, qualify as the functional equivalent of the border. The majority of interior checkpoints do not operate under the authority of "functional equivalency" to search cars that pass through the checkpoint, but instead, based on statutory authority under 8 U.S.C. § 1357(a)(3), where Congress allows "[a]ny officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant -- within a reasonable distance from any external boundary of the United States, to board and search for aliens [in] any . . . vehicle." 8 U.S.C. § 1357(a)(3). "Reasonable distance" has been interpreted to mean "within 100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2). The Tenth Circuit makes clear that certain interior checkpoints operate under 8 U.S.C. § 1357(a)(3)'s authority. In United States v. Rascon-Ortiz, 994 F.2d 749 (10th Cir. 1993)("Rascon-Ortiz"), when discussing a permanent border patrol checkpoint located on Highway 54, near Orogrande, New Mexico, roughly forty miles from the Mexico border, the Tenth Circuit states:

> We note this case involves a permanent checkpoint removed from the United States-Mexico border, as authorized by 8 U.S.C. § 1357(a)(1) and (a)(3) (1988); see 8 C.F.R. § 287.1(a)(2) (1992), and, therefore, all references in this opinion to checkpoints refer to checkpoints not located on the border. This is an important distinction as a citizen's Fourth Amendment rights at a checkpoint located on the border, or its functional equivalent, are significantly less than inside the border. See United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985); Almeida-Sanchez v. United States, 413 U.S. 266, 272-73 (1973).

Rascon-Ortiz, 994 F.2d at 727 n.4. The Court determines that the border checkpoint at which the United States detains Loza is a § 1357 checkpoint and does not operate under the authority of functional equivalency. The United States stops Loza at a checkpoint "near Alamogordo, New Mexico." Motion to Dismiss Class Action Complaint and Petition for Writ of Habeas Corpus, at

3, filed December 23, 2025 (Doc. 21). There are two permanent checkpoints near Alamogordo: one on US 70 east (Alamogordo), which is fifteen miles southwest of Alamogordo, and another on US 54 north, which is thirty miles south of Alamogordo.[27] See United States Border Patrol interior checkpoints, WIKIPEDIA, https://en.wikipedia.org/wiki/United_States_Border_Patrol_interior_ checkpoints#New_Mexico. The Tenth Circuit in Rascon-Ortiz decides that the US 54 checkpoint is a § 1357 checkpoint, and affirmatively states that this checkpoint is distinct from a checkpoint at the border or its functional equivalent. See 994 F.2d at 727 n.4. In accordance with this conclusion, the Court decides that all permanent checkpoints in New Mexico "removed from the United States-Mexico border" are checkpoints that § 1357 authorizes and therefore are not the border's functional equivalent. Accordingly, regardless whether the United States stops Loza at the US 54 or the US 70 checkpoint, the Court determines that this checkpoint is not the "functional equivalent" of the border such that Loza is "seeking admission" by virtue of presenting at this checkpoint and then becomes subject to § 1225(b)(2).

Even if, however, the checkpoint at which the United States detains Loza qualifies as the border's functional equivalent, the Court decides that the Supreme Court's determination in the Fourth Amendment context in Almeida-Sanchez v. United States, 413 U.S. at 272-73, does not counsel extending this functionality to conclude that an alien is an arriving alien "seeking admission" merely by virtue of passing through one of these checkpoints removed from the United States-Mexico border. 8 U.S.C. § 1225(b)(2). The functional equivalency of the border-fiction applies, because there are certain checkpoints that are so connected to the border that the Fourth

---

[27] The other permanent checkpoints in New Mexico are: (i) I-10 west, which is 22 miles west of Las Cruces; (ii) NM 11 north, which is 22.6 miles south of Deming; (iii) I-25 north, which is 23 miles north of Las Cruces; and (iv) NM 185 north, which is 13 miles northwest of Radium Springs. See United States Border Patrol interior checkpoints, WIKIPEDIA, https://en.wikipedia.org/wiki/United_States_ Border_Patrol_interior_checkpoints#New_Mexico.

Amendment protections that exist at these areas are the same as the protections that exist at the border. This equivalency does not mean, however, that every person passing through these checkpoints is arriving from outside of the United States. At the border, every person presenting for inspection at a port of entry is seeking to enter the country, but the Court does not conclude that every applicant for admission, who is arriving at the border, is "seeking admission," under § 1225(b)(2), because he or she is presenting at the precipice of the United States and asking for entry. An alien is not entering at these functional equivalencies to the border, where persons presenting for inspection are no longer seeking to enter the country, because they already have entered the country, some perhaps minutes ago and some perhaps years ago. The Court therefore concludes that presence at a functional equivalency checkpoint, without more, does not change an applicant for admission's status to seeking admission. The applicant for admission is already "present" in the country and is no longer "arriving" and therefore, merely going through a checkpoint is not "seeking admission" and is not seeking lawful entry into the country; this alien remains an "applicant for admission," but not an alien "seeking admission." Accordingly, the Court determines that United States detains Loza at a checkpoint removed from the United States-Mexico border, but he is not "seeking admission" by going through a checkpoint. Hence, although he is an applicant for admission, he is not seeking admission, and the United States cannot detain him under § 1225(b)(2). The United States, therefore, must detain him under § 1226(a) and afford him the procedural protections that this statute provides. The Court therefore overrules the Federal Respondents' Objection to Magistrate Judge Robbenhaar's conclusion that the United States must detain Loza under § 1226(a). The Court determines that the United States must detain Loza in accordance with the statutory provisions of § 1226(a), or, if the United States is unable or declines to follow § 1226(a)'s statutory requirements, the United States must release Loza immediately. The Court does not, however, order any relief consistent with this ruling, because the Court

sustains a later Objection in which the Federal Respondents object to the granting of relief beyond the scope of the Petitioners' TRO filings. See infra Section IV.

**B.    CASTILLO IS NOT SEEKING ADMISSION SUCH THAT HE CAN BE DETAINED UNDER § 1225(b)(2), AND ACCORDINGLY MUST BE DETAINED UNDER § 1226(a).**

Castillo is an applicant for admission, because he is an alien present in the United States without admission.  See 8 U.S.C. § 1225(a)(1).  The Court therefore looks first to whether the United States can detain Castillo under § 1225(b)(1).  The Court determines that the United States may not detain Castillo under § 1225(b)(1), because he is not an arriving alien or an alien present in the United States continuously for less than two years whom an inspecting immigration officer deems inadmissible under §§ 1182(a)(6)(C), (a)(7).  Accordingly, the Court next looks to whether the United States may detain Castillo under § 1225(b)(2).  The United States apprehends Castillo in El Paso, Texas on December 29, 2024, after the United States encounters Castillo at the El Paso County Detention Facility following an arrest for Burglary of Habitation.  See Motion to Dismiss Class Action Complaint and Petition for Writ of Habeas Corpus, at 3, filed December 23, 2025 (Doc. 21).  There is no indication that Castillo has any pending application or has taken any other action that indicates that he is actively seeking admission.  The Court determines, therefore, that Castillo is not an applicant for admission seeking admission such that the United States can detain Castillo under § 1225(b)(2).  Instead, the United States must detain Castillo under § 1226(a).  Accordingly, the Court overrules the Federal Respondents' Objection to Magistrate Judge Robbenhaar's conclusion that the United States must detain Castillo under § 1226(a).  The Court determines that the United States must detain Castillo in accordance with § 1226(a)'s statutory

provisions, or, if the United States is unable or declines to follow § 1226(a)'s statutory requirements, the United States must immediately release Castillo.[28]

## II.   THE COURT SUSTAINS IN PART AND OVERRULES IN PART FEDERAL RESPONDENTS' OBJECTION TO THE MAGISTRATE JUDGE ROBBENHAAR'S CONCLUSION IN THE PFRD THAT PETITIONERS' DUE PROCESS RIGHTS ARE VIOLATED BECAUSE OF THEIR DETENTION <u>WITHOUT BOND UNDER § 1225(b)(2).</u>

The due process rights afforded to an alien depend on whether that alien is subject to territorial standing or the entry fiction doctrine. <u>See</u> <u>Singh</u>, 2026 WL 146005 at 36 (Browning, J.)("[T]he rule of territorial standing presumes that aliens who reach United States soil under their own power -- legally or illegally -- have ties to the community sufficient to confer a wide range of Constitutional rights . . . . The entry doctrine, by comparison, concludes that aliens whom the United States permits into the country absent some legal right to be there -- e.g. paroled -- have no community ties, and, therefore, relatively few rights."). Aliens subject to territorial standing -- aliens who have entered the United States without encountering law enforcement -- have greater due process rights than aliens subject to the entry fiction -- aliens whom the United States permits

---

[28] Normally, this conclusion would require that the Respondents provide Castillo with a bond hearing. Castillo's current detainment, however, comes as result of an appeal from a bond hearing under § 1226(a) that occurs on August 28, 2025, during which the IJ determines that Castillo proves, by clear-and-convincing evidence, that he is neither a danger to society nor a flight risk. <u>See</u> PFRD at 6. Instead of releasing Castillo, Castillo remains in custody during the pendency of DHS' appeal of the IJ's bond hearing decision, in which the BIA overturns the IJ's bond decision, not on the merits, but on jurisdictional grounds after concluding incorrectly that the United States can hold Castillo under § 1225(b)(2). <u>See</u> <u>Matter of Antonio Adrian Castillo</u>, No. Redacted, at 1, (B.I.A. Dec. 5, 2025)(unpublished). The United States does not order another hearing. The United States already has given Castillo a bond hearing at which he makes the successful showing required to obtain bond and the opportunity for release. Accordingly, unless the United States wishes to challenge the IJ's bond determination on its merits, the United States must honor the IJ's bond determination and allow Castillo immediate release if he complies with the terms of the bond. The Court does not, however, order any relief consistent with this ruling, because the Court sustains a later Objection in which the Federal Respondents object to the granting of relief beyond the scope of the Petitioners' TRO fiings. <u>See</u> <u>infra</u> Section IV.

into the country under the power of the United States government.  The facts in the record

demonstrate that Loza is subject to territorial standing, see PFRD at 4 ("[Loza] first arrived in the

U.S. around August 1999, without inspection"), but the record is unclear with regards to Castillo.

The Court therefore undertakes a due process analysis assuming both that Castillo is subject to

territorial standing and assuming that he is subject to the entry-fiction doctrine.

For aliens subject to the entry-fiction doctrine, their procedural due process rights are

limited to what the statute affords.[29]  See Singh, 2026 WL 146005, at * 37 (citing Thuraissigiam,

---

[29] While the Supreme Court has said that Constitutional Due Process for aliens the United
States detains "on the threshold" is all the process that Congress gives, that does not seem like
sound Constitutional analysis, for several reasons.  First, the Constitution exists before any
immigration statute, so the Constitution provided some protection to aliens before Congress passes
the first immigration statues -- The Alien and Sedition Acts -- in 1798.  Andrew Baxter & Alex
Nowrasteh, A Brief History of U.S. Immigration Policy from the Colonial Period to the Present
Day (Aug. 3, 2021), https://www.cato.org/policy-analysis/brief-history-us-immigration-policy-
colonial-period-present-day?gad_source=1&gad_ campaignid=22458109145&gclid=EAIaIQobC
hMI14vHmsq9kgMVxWRHAR1aky1qEAAYASAAEgIy7_D_BwE.  The question is what Due
Process required before the 1798 statutes.  Presumably there was some protections for aliens before
that statute.  It seems better to decide what the Constitution provided then and provides now than
just refer to a statute.
     Second, the Court is uncomfortable with the idea that every violation of the statute is a
Constitutional violation.  Normally, the Constitution is a floor, and Congress must provide process
above the floor to be Constitutional.  By describing Due Process as nothing more than what the
Congress provides, the Supreme Court is not giving Congress or the lower courts guidance
concerning what Due Process requires.  In other words, saying that the rule is whatever Congress
gives is Constitutional Due Process is no Constitutional guidance at all.
     Third, ever since Marbury v. Madison, 5 U.S. 137 (1803), the Supreme Court has insisted
that it is the arbitrator of what the Constitution means.  In the immigration area, the Supreme Court
gives this power to Congress.  When the lower courts desperately need guidance, the Supreme
Court is not to be found.
     Fourth, when Congress changes the law, the Constitution changes.  Congress decides what
the Constitution means and protects.  Thus, what can happen is that Constitutional protections can
go and down.  For the nation and for the federal judiciary, that Constitutional protections can go
down or away is odd.  It seems that the best approach would be for the Supreme Court to drop this
whatever-Congress-says standard, and do what it does in other areas and decide what the
Constitution requires.  In other words, the Supreme Court needs to do what Chief Judge Marshal
in Marbury v. Madison, claims as its own job.  The Supreme Court needs to decide what the
Constitution protects.
     Procedural Due Process requires notice and the opportunity to be heard.  Notice probably
is not the issue if the United States is detaining the alien; the issue is the hearing.  Likely, the

591 U.S. at 139; Zadvydas, 533 U.S. at 693).  Section 1226(a) affords detained aliens a bond hearing; therefore, the United States' continued detainment of Loza and Castillo without the provision of a bond hearing violates the procedurally afforded rights of § 1226(a).  Accordingly, because an alien's procedural due process rights are equivalent to the process that Congress provides under the statute, that violation of the statute for these aliens equates to a violation of their procedural due process rights.  The remedy, however, is not a Constitutional analysis to see if the alien is entitled to greater process; instead, the only remedy is to afford the alien the process that the statute authorizes, because the alien is not entitled to any greater process.  See Sierra Immigr. & Naturalization Serv., 258 F.3d 1213, 1218 (10th Cir. 2001)(explaining the procedural due process of an alien subject to the entry fiction: "'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)).

For aliens subject to territorial standing, however, they receive greater due process protections that the Constitution affords.  See Zadyvas, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstances change, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").  The Fourteenth Amendment to the United States Constitution protects citizens from the deprivation of "life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. XIV § 1.  "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision . . . ."  Archuleta

---

United States is detaining the alien or about to detain the alien.  The issue probably is removal or not removal, and detention if removal is appropriate.  That a limited hearing probably is all that the Due Process gives.  It does not require a bond hearing, any particular burden of proof, or any burden of proof on the United States.  It seems that fleshing out what the Constitution minimally requires makes more sense than referring to the statute for Constitutional analysis.

v. Colo. Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (10th Cir. 1991). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006).

First, the Court determines that aliens subject to territorial standing possess a protected liberty interest to which due process is applicable. "Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 678 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992)). Second, the Court considers whether a territorial alien detained without any procedure other than an immigration officer's initial determination that the alien is inadmissible is afforded sufficient process. The Court determines that this procedure is adequate. First, the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Demore v. Kim, 538 U.S. 510, 522 (2003)("Demore"). Second, the Court notes the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." Demore, 538 U.S. at 526.

The Court looks to two Supreme Court decisions discussing the due process rights of aliens in the immigration context to inform its analysis: Zadvydas and Demore. In Zadvydas, the Supreme Court looks at whether the Attorney General may detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal. See 533 U.S. at 682. The Supreme Court determines that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem" and therefore reads into § 1231 a reasonable time limit on detention. Zadvydas, 533 U.S. at 690. Looking first at the United States'

interests in indefinite detention, the Supreme Court identifies two: ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community. See Zadvydas, 533 U.S. at 690. The Supreme Court decides that the first interest, ensuring appearance, is "weak or nonexistent where removal seems a remote possibility at best," and that, "where detention's goal is no longer practically attainable, detention no longer 'bear[s][a] reasonable relation to the purpose for which the individual [was] committed.'" Zadvydas, 533 U.S. at 690 (quoting Jackson v. Indiana, 406 U.S. 715, 738 (1972)). The second interest, protecting the community, is also weak, because the provision authorizing detention does not apply narrowly to a small group of dangerous individuals, "but broadly to aliens ordered removed for many and various reasons, including tourist visa violations." Zadvydas, 533 U.S. at 691. Further, "once the flight risk justification evaporates, the only special circumstance present is the alien's removable status itself, which bears no relation to a detainee's dangerousness." Zadvydas, 533 U.S. at 691-92. The Court weighs these interests against the alien's liberty interest -- freedom from imprisonment -- and concludes that "an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, the Constitution permits detention that is indefinite and potentially permanent." Zadvydas, 533 U.S. at 696.

In Demore, by contrast, the Supreme Court considers a challenge to detention without a determination that the alien poses either a danger to society or a flight risk under § 1226(c), which authorizes the detention of certain criminal aliens. See Demore, 538 U.S. at 514. The Supreme Court determines that "[d]etention during removal proceedings is a constitutionally permissible part of that process." Demore, 538 U.S. at 531. In doing so, the Supreme Court draws two major distinctions between the interests at issue in Demore and the interests in Zadvydas. Looking first to the United States' interest, the Supreme Court explains that, in Zadvydas, the aliens challenging their detention following the final orders of deportation are ones for whom removal is "no longer

- 106 -

practically attainable," and therefore detention no longer served its purported immigration purpose of preventing aliens from fleeing prior to their removal.  Demore, 538 U.S. at 527.  By contrast, in Demore, the detention of these criminal aliens is pending their removal proceedings, which "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  538 U.S. at 527-28.  The Supreme Court highlights that, "in adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." Demore, 538 U.S. at 528.  Second, looking at the alien's interest in liberty, the Supreme Court distinguishes Zadvydas on the grounds that the detention in Zadvydas is "indefinite" and "potentially permanent," whereas the detention under § 1226(c) is of a "much shorter duration." Demore, 538 U.S. at 529.  Specifically, in around eighty-five percent of cases under § 1226(c), the United States completes removal proceedings in an average time of forty-seven days, and the United States completes the remaining fifteen percent in an average of four months.  See Demore, 538 U.S. at 529.  Based on the balance of interests under § 1226(c), the Supreme Court concludes that detention during removal proceedings under § 1226(c) is Constitutional in the absence of a detainment hearing.  See Demore, 538 U.S. at 531.

Weighing the interests in the present case, the Court concludes that Demore counsels the conclusion that detainment of a non-criminal territorial alien without a detainment hearing does not violate procedural due process.  Looking at the United States' interests first, the United States detains the aliens in this case, similar to the aliens in Demore, pending their removal hearings. Accordingly, the United States' interest in preventing deportable aliens from fleeing and thus increasing the chance that they will be removed, applies to this group of aliens as it does to the

aliens in <u>Demore</u>.  In <u>Demore</u>, there are Congressional findings which indicate that permitting "discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens" absconding, whereas, here, the provisions apply to a large group of aliens, many of whom have not committed crimes other than illegal entry.  <u>Demore</u>, 538 U.S. at 528.  The Supreme Court in <u>Zadvydas</u>, however, indicates that the United States' interest in preventing flight applies in all immigration proceedings as long as removal still remains a genuine possibility.  See <u>Zadvydas</u>, 533 U.S. at 690.  The Court concludes that the United States maintains a strong interest in ensuring that aliens show up for removal proceedings, because the United States has an interest in ensuring that it is able to carry out its immigration laws.  The second United States interest that <u>Zadvydas</u> identifies, however, preventing danger to the community, does not apply to these aliens, because these statutory provisions apply to a broad swath of aliens, many if not most of whom have not committed any crime other than illegal entry.  Accordingly, the only special circumstance present is the alien's illegal status, which bears no relation to a detainee's dangerousness.  Looking at the United States' interest in detention, therefore, the Court concludes that it is greater than the United States' interest in <u>Zadvydas</u>, yet weaker than the United States' interest in <u>Demore</u>.

The Court then turns to the alien's interest in liberty during the pendency of the removal proceedings.  The Court notes that the timeframe of detention for territorial aliens pending normal removal proceedings under § 1229(a) is shorter than the "indefinite" period of detention present in <u>Zadvydas</u>, because, unlike in <u>Zadvydas</u>, the period of detention pending removal proceedings has a definite end date -- the conclusion of removal proceedings -- making the alien's liberty interest here weaker than in <u>Zadvydas</u>.  The Court also acknowledges, however, that detention for aliens pending removal proceedings under § 1229(a) can take longer than the average removal proceedings under § 1226(c) in <u>Demore</u>, lasting anywhere from several months to several years.

See How Long Do Removal Proceedings Take?, LEGALCLARITY, https://legal clarity.org/how-long-do-removal-proceedings-take/.  Accordingly, the Court concludes that the alien's liberty interest here is weaker than the alien's interest in Zadvydas, yet stronger than the alien's interest in Demore, because the alien faces a detention period of longer than the forty-seven day period in Demore, yet shorter than the "indefinite" detention in Zadvydas. Weighing the balance between the United States' interests in detention pending removal and the alien's interest in liberty during the removal proceedings, the Court concludes that the alien's interest does not outweigh the United States' interest sufficiently to overcome the Supreme Court's declaration in Demore that "[d]etention during removal proceedings is a constitutionally permissible part of that process," such that detention during removal proceedings requires certain process to be fair.[30]  538 U.S. at 531.

---

[30] The Due Process Clause applies to "all persons" within the United States.  U.S. Const. amend. V.  Congress possesses plenary power to exclude aliens, but the courts historically constrain that power when Congress exercises that power in deportation proceedings as opposed to exclusion proceedings.  Courts accept that Congress may prescribe the procedures governing removal proceedings, whether exclusion or deportation, but courts retain the authority, and the duty, to ensure that those procedures comport with the Constitution.  See Neuman at 989 (stating that habeas is a right "to keep executive adjudicators within their authority").  The Judiciary, not Congress or the Executive, bears responsibility for saying what the law is and determining whether an Act of Congress comports with Constitutional limits.  See Loper Bright Enterprises v. Raimondo, 603 U.S. at 369 ("It is emphatically the province and duty of the judicial department to say what the law is'" (quoting Marbury v. Madison, 5 U.S. 137, 163 (1803)).

The Fifth Amendment provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Procedural due process protects all persons' interests in life, liberty, and property by providing them notice and an opportunity to be heard.  See Trump v. J. G. G., 604 U.S. 670, 673 (2025)("So, the detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.' (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950))).  The question here concerns what procedural due process requires.  This inquiry inherently is fact dependent.  Process sufficient for one category of alien may not be sufficient for another alien, because of the inquiry's fact dependent nature.

Turning to the caselaw, Jennings does not eliminate completely all concerns about § 1225(b)(2).  Justice Alito does not hold that § 1225(b)(2) is Constitutional; instead, he declines to read into the statute limitations that Congress does not include.  See Jennings, 583 U.S. at 286 (stating that the Ninth Circuit errs, because it does not "interpret the statute" and instead "rewrite[s]

it").  The Court then remands the Constitutional challenges for the lower courts to consider the Constitutional issues "on their merits."  583 U.S. at 312.  Addressing those arguments may require application of the <u>Mathews'</u> factors; however, the Supreme Court uses a general balancing framework.  That analysis, however, is not mechanical, because § 1225(b)(2) applies to multiple categories of "other aliens."  <u>Singh</u>, 2026 WL 146005 at *18-19.  The statute governs both (i) arriving aliens inadmissible for reasons other than two documentation deficiencies referenced in § 1225(b)(1); and (ii) aliens present in the United States for more than two years.  <u>See</u> <u>Singh</u>, 2026 WL 146005 at *18-19.  Section 1225(b)(2) applies to aliens who possess different degrees of protection under the Due Process Clause -- namely, aliens subject to the entry fiction and aliens with territorial standing.  <u>See Singh</u>, 2026 WL 146005 at *31-32.

The Supreme Court makes clear that, for arriving aliens, due process requires only the process that Congress provides.  <u>See Shaughnessy</u>, 338 U.S. at 544.  As the Court discusses below that conclusion follows logically as a straightforward application of the weighing the interests involved.  Arriving aliens possess no cognizable liberty interest in freedom on United States soil, no protected property interests, and face no United States-caused jeopardy to life.  The Supreme Court extends this reasoning to arriving aliens permitted physical ingress into the United States, subjecting them to the entry fiction.  <u>See Kaplan</u>, 267 U.S. at 230.  Aliens subject to the entry fiction, though physically present within the United States' border, remain in a Constitutionally precarious position.  They enter the United States on the implicit condition that, once the United States determines their admissibility, it may remove them without further process.  That condition limits both the connections such aliens form with the community and the fundamental rights they may acquire while removal proceedings remain pending.  <u>See Osorio-Martinez v. Att'y Gen. United States of Am.</u>, 893 F.3d 153, 158 (3d Cir. 2018)("As we explained in <u>Castro</u>, only aliens who have developed sufficient connections to this country may invoke our Constitution's protections.").

Accordingly, application of a balancing analysis to arriving aliens and entry-fiction aliens presents little Constitutional difficulty.  The private interests at stake are minimal at most; arriving aliens possess no liberty or property interests, and entry-fiction aliens understand that any such interests are temporary and contingent.  By contrast, the United States' interests, ensuring appearance at removal proceedings and protecting the community, are substantial, particularly given the uncertainty surrounding flight risk and dangerousness at the point of entry.  In this context, the United States' interests outweigh both the risk of erroneous deprivation and the marginal value of additional procedural safeguards.  Put simply, where the Due Process Clause's protected interests are effectively zero, the risk of unconstitutional deprivation is likewise negligible.  That is why weighing the United States interests against the arriving or entry-fiction aliens' interests present little Constitutional difficulty.

<u>Zadvydas</u> and <u>Demore</u> guide the Court on conducting the analysis when the equation is no longer as clear cut.  In <u>Zadvydas</u>, the Supreme Court considers what due process requires when an alien's liberty interest, although limited, is subjected to potentially indefinite detention and where the United States' interests are no longer as strong.  <u>See Zadvydas</u>, 533 U.S. at 690-692.  Justice Breyer weighs the interests the United States asserts -- ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community -- against the petitioners' risk of lifelong detention.  <u>See Zadvydas</u>, 533 U.S. at 691.  Unlike arriving aliens, the aliens in <u>Zadvydas</u> face detention with no foreseeable end.  <u>See Jennings</u>, 583 U.S at 299 ("To start, §§ 1225(b)(1) and (b)(2), unlike § 1231(a)(6), provide for detention for a specified period of time.").  The risk that the aliens in <u>Zadvydas</u> face is high.  <u>Jennings'</u> aliens face detention pending

proceedings; the <u>Zadvydas</u> aliens faced detention for life.  The Supreme Court finds that risk so severe that it construes § 1231 to include a temporal limitation.

In addition to the risk, the Supreme Court emphasizes that the United States' interests weaken as removal became increasingly remote.  Preventing flight "is weak or nonexistent where removal seems a remote possibility at best," and detention that no longer bears a reasonable relation to its purpose violates due process.  <u>Zadvydas</u>, 533 U.S. at 690.  With respect to protecting the community, Justice Breyer explains that preventive detention is Constitutionally permissible only when limited to specially dangerous individuals and only with strong procedural protections.  <u>See</u> <u>Zadvydas</u>, 533 U.S. at 690 ("But we have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections.").  The Constitutional instruction which <u>Zadvydas</u> provides is that Due Process Clause does not tolerate extended detention without sufficient justifications even when an alien's private interests are negligible.

<u>Demore</u> provides another data point for analyzing understanding the Constitutional balancing the Due Process Clause requires.  In <u>Demore</u>, the Supreme Court upholds mandatory detention for certain criminal aliens, during removal proceedings, under § 1226(c).  <u>See</u>, 538 U.S. at 513.  "We hold that Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the brief period necessary for their removal proceedings."  <u>Demore</u>, 538 U.S. at 513.  The specificity of Chief Justice Rehnquist's holding informs the Court's understanding of the Constitutional analysis.

First, Congress justifies its concern as to deportable criminal aliens.  <u>See</u> <u>Demore</u>, 538 U.S. at 518 (citing Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); S.Rep. No. 104-48, at 1 (1995)(stating that "confinement of criminal aliens alone cost $724 million in 1990")).  In addition to the costs, these criminal aliens "often committed more crimes before being removed."  <u>Demore</u>, 538 U.S. at 518-519 ("One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45% -- nearly half -- were arrested multiple times before their deportation proceedings even began." (citing <u>Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary</u>, 101st Cong., 1st Sess., at 54, 52 (1989))).  This data goes to the United States' interest in detaining these aliens, which is weak in <u>Zadvydas</u>.  Indeed, the Supreme Court distinguishes <u>Zadvydas</u>, stating that it is "materially different," because "there, 'detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed.'"  <u>Demore</u>, 538 U.S. at 527 (quoting <u>Zadvydas</u>, 533 U.S. at 690).

Chief Justice Rehnquist also includes the second material distinction in his holding.  <u>See</u> <u>Demore</u>, 538 U.S. at 513.  "<u>Zadvydas</u> is materially different from the present case in a second respect as well.  While the period of detention at issue in <u>Zadvydas</u> was 'indefinite' and 'potentially permanent,' 533 U.S., at 690-691, the detention here is of a much shorter duration."  <u>Demore</u>, 538 at 529.  The Supreme Court then provides the statistics that removal proceedings complete "in an average time of 47 days and a median of 30 days."  538 U.S. at 529.  Moreover, the "statistics do not include the many cases in which removal proceedings are completed while the alien is still serving time for the underlying conviction."  538 U.S. at 529.  The Supreme Court uses a balancing framework in upholding § 1226(c) similar to the approach taken in <u>Zadvydas</u>.

———————————

The dissent in Demore notes that the Due Process Clause gives long-time permeant residents ("LPRs") "greater protections than other aliens." Demore, 538 U.S. at 547 (Souter, J., concurring in part)(citing Landon v. Plasencia, 459 U.S. 21 (1982)). The Constitution affords LPRs more protection for their "person and property," because immigration laws give LPRs "the opportunity to establish a life permanently in this country by developing economic, familial, and social ties indistinguishable from those of a citizen." Demore, 538 U.S. at 544 (Souter, J., concurring in part). See United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); Woodby v. Immigr. & Naturalization Serv., 385 U.S. 276, 285 (1966)(holding that deportation orders need clear, unequivocal, and convincing evidence owing to the "drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification").

> The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. . . . [A]t least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties -- such as the due process of law of the Fourteenth Amendment.

Johnson v. Eisentrager, 339 U.S. 763, 770-71 (1950).

Justice Souter argues that the interests in Demore are greater than those in Zadvydas even though both cases concern LPRs. Demore, 538 U.S. at 544 (Souter, J., concurring in part). The petitioner in Demore is not subject to a "final order of removal," so he has a right to remain in the country, and detention will "impede the alien's ability to develop and present his case on the very issue of removability.'" Demore, 538 U.S. at 554 (Souter, J., concurring in part). Nonethless, the majority uphold § 1226(c) after considering Zadvydas. Demore teaches that the United States' interests assume particular significance in the immigration context, and courts must therefore apply a balancing framework with a presumption that accords more weight to those interests.

Zadvydas and Demore guide the Court's analysis. The Court now turns to the Constitutional inquiry Jennings remands. For arriving aliens and entry-fiction aliens, the analysis remains straightforward unless detention becomes prolonged in a manner resembling Zadvydas. The difficult questions arise for aliens with territorial standing, who have developed substantial connections with this country. Such aliens enjoy greater due process protections than arriving aliens, but the extent of those protections depends on the facts. An alien who effects an entry and the United States discovers months later should not possess the same liberty and property interests as an alien who enters and remains undiscovered for decades. An alien who quietly builds a life in the United States, establishing family, employment, and community ties, possesses liberty and property interests similar in some respects to those of a citizen.

Regardless, the Court still concludes that for these territorial aliens, who do not have convictions and whom the United States apprehends during routine enforcement, the Due Process Clause does not demand certain process under procedural due process. Their liberty and property interests exceed those of arriving aliens but fall short of those of LPRs. And although the United States' interest in protecting the community carries less force here than in Demore, the United States still has a strong interest in ensuring that removable aliens attend their removal hearings and that upon reaching a final removal determination, the United States is capable of removing them.

This conclusion does not mean, however, that the United States may detain territorial aliens forever without any process.  See Demore, 538 U.S. at 532 (Kennedy, J., concurring)("For similar reasons, since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.").  All aliens, whether subject to the entry-fiction doctrine or territorial standing, have substantive due process rights separate and apart from the statute.  See Singh, 2026 WL 146005 , at *39.  The United States may violate an alien's substantive due process rights if immigration detention becomes punitive.  See Singh, 2026 WL 146005, at * 39 (citing the following language from Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382, 1387 (10th Cir. 1981): "[A]n excluded alien in physical custody within the United States may not be 'punished' without being accorded the substantive . . . due process guarantees of the Fifth Amendment.").  Nevertheless, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment."  United States v. Salerno, 481 U.S. 739, 746 (1987).  A restriction on liberty is punitive rather than regulatory if (i) the United States intends to impose punishment, or (ii) the restriction is not rationally related to a legitimate nonpunitive United States purpose or is excessive

---

There may come a time, however, when detention becomes so long that the detention no longer supports the United States interest in detaining the alien.  At that point, the Due Process Clause requires that the alien be afforded some process.  The Court believes, however, that the appropriate vehicle for determining when that process must be afforded comes from substantive due process, not procedural due process.  In sum, the Court thinks that the United States will need to give the detained alien a hearing after some period of time.  The Court believes that period of time, however, properly comes from substantive rather than procedural due process, and relies on the factually specific liberty interests of the aliens at issue.

in relation to that purpose.  See United States v. Salerno, 481 U.S. at 747.  The Court determines that neither Petitioner demonstrates, at this time, that their detention is so long that it has crossed over into punishment and is therefore a violation of their due process rights.  First, the Petitioners provide no evidence that their detention is the result of an intent to punish on the United States' part.  Further, the Court determines that Loza and Castillo's detentions to date, from August 16, 2025, and January 3, 2025 respectively, are not so long so as to qualify as "excessive in relation" to the purpose of facilitating deportation.  PFRD at 4-5.  When there is "an unreasonable delay by the INS in pursing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation . . . but to incarcerate for other reasons." Demore v. Kim, 538 U.S. at 532-33 (Kennedy, J, concurring).  The Court does not draw a bright-line rule of what constitutes an "unreasonable delay," but concludes that the approximate six months and thirteen months detention up to this point do not constitute a violation of Petitioners' substantive due process rights.

Accordingly, the Court concludes that the continued detention without a hearing for Loza, whom the Court concludes is subject to territorial standing, does not violate his due process rights, either procedural or substantive.  Instead, the denial of a bond hearing when he is properly held under § 1226(a) constitutes a statutory violation which must be rectified by the Federal Respondents if they are to continue to detain him under § 1226(a).  There are insufficient facts in the record to determine whether Castillo is subject to territorial standing or the entry fiction doctrine.  Assuming that Castillo is subject to the entry-fiction doctrine such that a violation of § 1226(a) rises to the level of a violation of his due process rights, the only remedy that Castillo is entitled to is compliance with the statutory due process of § 1226(a), if the United States continues

to detain him.[31]    Accordingly, the Court sustains in part and overrules in part the Federal Respondents' Objection to Magistrate Judge Robbenhaar's conclusion in the PFRD that Petitioners' detention violates Petitioners' due process rights.

### III.    THE COURT SUSTAINS THE FEDERAL RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE ROBBENHAAR'S CONCLUSION THAT THE BURDEN SHOULD SHIFT TO THE UNITED STATES AT FUTURE BOND HEARINGS.

Section 1226(a) states that the Attorney General may release an alien on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General . . . ." but does not prescribe anything further about what the bond hearing shall look like.  8 U.S.C. § 1226(a).  Section 1226(c), which requires the Attorney General to take into custody aliens charged with, arrested for, or convicted of certain crimes, discusses the release of these aliens if the release is necessary for certain investigatory or other prosecutorial purposes and the "alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding."  8 U.S.C. § 1226(c)(4).  Nothing in the statute indicates, however, that this requirement that the alien demonstrate they are not a danger to the community or flight risk before release described in § 1226(c)(4) for criminal aliens applies to the bond hearing described in § 1226(a).

The BIA is responsible for implementing the current structure of the bond hearing under § 1226(a).  See Velasco Lopez v. Decker, 978 F.3d 842, 849 (2d Cir. 2020)("Decker").  Following

---

[31] The due process analysis that Judge Robbenhaar undertakes in the PFRD relates to Castillo's detention during the automatic stay that DHS invokes during the pendency of the appeal before the BIA regarding the IJ's initial bond determination for Castillo.  The BIA concludes Castillo's appeal in the United States' favor on December 5, 2025, and since then the United States has been detaining Castillo under the assumed authority of § 1225(b)(2), which the Court now determines must be the authority of § 1226(a).  See Matter of Antonio Adrian Castillo, No. Redacted, at 1, (B.I.A. Dec. 5, 2025)(unpublished).  Accordingly, the question of due process considerations of detention during the pendency of a BIA appeal is now moot.  The only due process analysis the Court undertakes for Castillo is equivalent to the analysis for Loza -- the due process considerations regarding continued detention without a bond hearing.

the IIRIRA's enactment, INS implements new regulations that impose the standard for the initial post-arrest custody determination that immigration officials make.  8 C.F.R. § 236.1(c)(2)-(8).  The regulations establish a presumption of detention and place on the arrested individual the burden of demonstrating, to the arresting officer's satisfaction, that release will not pose a danger to property or persons, and that the individual is likely to appear for any future proceedings.  See 8 C.F.R. § 236.1(c)(8).  The regulation applies only to the initial custody determination that the arresting officer makes and not to immigration judges in bond hearings.  See 8 C.F.R. § 236.1(c)(8)("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.").  Shortly after INS implements the new regulations, however, the BIA applies the rule provided in § 236.1(c)(8) for arresting officers, including the presumption for detention, to bond hearings the immigration judges conduct under § 1226(a).  See, e.g., In Re Adeniji, 22 I. & N. Dec. 1102, 1113 (BIA 1999)("From the outset, therefore, the regulations under IIRIRA have added as a requirement for ordinary bond determinations under section 236(a) of the Act [1226(a)] that the alien must demonstrate that 'release would not pose a danger to property or persons,' even though section 236(a) does not explicitly contain such a requirement.").

The Court considers whether it has the authority to tell the United States what the bond hearing must look like on a habeas petition.  The writ of habeas corpus has long functioned as a judicial mechanism for testing the lawfulness of detention.  See Peyton v. Rowe, 391 U.S. 54, 63 (1968)("[A] principle aim of the writ is to provide for swift judicial review of alleged unlawful restraints on liberty.").  Further, the Supreme Court's traditional understanding of the writ is that courts generally do not use habeas to "order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody."  Wilkinson v. Dotson, 544

U.S. at 86 (Scalia, J., concurring).  The Court acknowledges that the writ is an "adaptable remedy," whose "precise application and scope changed depending upon the circumstances," but the Court understands this adaptability to still be cabined within the context of a challenge to illegal confinement.  See Boumediene, 553 U.S. at 779-80.  See Jones v. Cunningham, 371 U.S. 236, 243 (1963)(explaining that the writ of habeas "now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose -- the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty" when allowing a habeas challenge to parole conditions which "significantly confine and restrain [Petitioner's] freedom").

The Court therefore concludes that a challenge to detention without any hearing, which relegates an alien to mandatory detainment pending removal proceedings, is appropriate under the writ of habeas.  By contrast, however, the Court concludes that a challenge to the burden that an alien's § 1226(a) bond hearing imposes -- a challenge to the structure of the available bond hearing -- is not appropriate under a habeas petition unless the bond hearing's existing structure is so weighed against the alien that the alien has no chance to be released on bond.  In other words, if the bond hearing's structure is such that no alien has a meaningful chance of success at achieving release, this is such a denial of liberty that a challenge to this process is not beyond writ of habeas' expansive reach, because the challenge is to detention, not directly to process.  The remedy, in that case, is release and not the Court telling the United States how to do hearings.  The Court determines, however, that the § 1226(a) bond hearing's current structure does not qualify as a process so detrimental to the alien's liberty access that it may be challenged under the writ of habeas, because the writ does not qualify as a challenge to wrongful detention.  The current § 1226(a) bond hearing requires only that an alien prove that he or she is not a flight risk nor a danger to the community before the United States releases the alien on bond.  This burden does not present an extensive barrier to an alien seeking release, and, in fact, many aliens receive release on bond

during the pendency of their removal proceedings. That Castillo, who already has received a §

1226(a) bond hearing, is able to successfully demonstrate to the IJ that he is not a flight risk or

danger to the community, and is granted the right to release on bond, underscores that the process

does not violate due process. See PFRD at 6. The fact that the BIA later overturns this decision

on jurisdictional grounds, concluding incorrectly that the United States can hold Castillo under §

1225(b)(2) instead of § 1226(a), does not negate the fact that Castillo is able to successfully carry

his burden at the § 1226(a) hearing. See Matter of Antonio Adrian Castillo, No. Redacted, at 1,

(B.I.A. Dec. 5, 2025)(unpublished), filed December 23, 2025 (Doc. 21). Accordingly, the Court

determines that it cannot decide on a habeas petition what the § 1226(a) bond hearing's structure

must be, and as a result sustains the Federal Respondents' Objection to Magistrate Judge

Robbenhaar's conclusion that the United States must carry the burden by clear-and-convincing

evidence that an alien is a flight risk or a danger to the community before denying bond under §

1226(a).

**IV. THE COURT SUSTAINS THE FEDERAL RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE ROBBENHAAR'S CONCLUSION THAT THE PFRD AFFORDS THE PETITIONERS' RELIEF WHICH THE PETITIONERS DO NOT SEEK IN THEIR MOTION FOR A TRO.**

The PFRD responds only to the Petitioners' Motion for TRO and Petitioners' Amended

Motion for Temporary Restraining Order, filed November 6, 2025 (Doc. 5)("Amended TRO").

PFRD at 1. The Petitioners file the Motion for the TRO after they file their Class Action

Complaint, because Castillo is assigned a new IJ and is subsequently rescheduled to an earlier final

individual hearing on November 5, 2025. See TRO ¶ 6, at 2. This action is important for the

Petitioners' claim, because after Castillo has a final order of removal, he will be subject to detention

under a different statute of the INA, at which point allegedly "his physical liberty will be deprived

without proper adjudication of his claims in this lawsuit." TRO ¶ 5, at 2. The only relief that the

Petitioners seek in the TRO Motion is that the Court enjoin the Respondents from proceeding on removal cases for the Petitioners and enjoin Respondents from transferring the Petitioners out of the Otero Processing Center.  See TRO at 3.  The Petitioners then file the Amended Motion for TRO, because Castillo's hearing is rescheduled from November 5, 2025 to November 17, 2025.  See Amended TRO ¶ 5, at 2.  The Petitioners' request for relief is not different, however, from the relief that the first TRO seeks, and they request again that the Court enjoin the Respondents from proceeding on the Petitioners' removal cases and enjoin the Respondents from transferring the Petitioners out of the Otero Processing Center.  See Amended TRO at 3.

The PFRD recommends further relief than is requested in these motions, however, because Magistrate Judge Robbenhaar concludes that, implicit in the Brief in Support of the Motion for Temporary Restraining Order, filed November 3, 2025 (Doc. 4)("TRO Brief"), is a request for "injunctive relief requiring compliance with the applicable due process requirements to prevent continuing the constitutional due process deprivations."  PFRD at 10.  The Court disagrees with this conclusion.  It is true that the TRO Brief explains why the Petitioners believe they are likely to succeed on the claims they bring in their Class Action Complaint as support for why the Court should grant the TRO.  The first page of the TRO Brief, however, indicates that the claims in the Class Action Complaint are separate and apart from the relief that the TRO requests:

> Plaintiffs (or Petitioners), Antonio Adrian Castillo (individually as "Mr. Castillo") and Juan Jose Leon Loza (individually as "Mr. Leon Loza"), have filed the instant lawsuit and petition for Habeas Corpus against Defendants alleging violations of the Due Process Clause, the Administrative Procedure Act, and the Immigration and Nationality Act ("INA").  Because Defendants (or Respondents) have assigned a new Immigration Judge to Mr. Castillo's case and, subsequently rescheduled it to an earlier hearing, Plaintiffs have filed a Motion for Temporary Restraining Order.

TRO Brief at 1.  Accordingly, the Court agrees with the Federal Respondents that the PFRD incorrectly grants relief that the Petitioners do not seek in either their TRO Motion or Amended

TRO Motion by concluding that the United States should release Castillo and the United States should grant Loza a bond hearing under § 1226(a).[32]  See PFRD at 26.  As stated above, however, if the issue of relief under § 1226(a) comes properly before the Court, the Court concludes that the United States must detain both Loza and Castillo under § 1226(a) in accordance with the statutory provisions, or immediately release them.

**V.     THE COURT SUSTAINS THE FEDERAL RESPONDENTS' OBJECTION TO THE MAGISTRATE JUDGE ROBBENHAAR'S CONCLUSION THAT THE RESPONDENTS CANNOT TRANSFER, UNDER THE ALL WRITS ACT, 28 U.S.C. § 1651, THE PETITIONERS OUT OF THE UNITED STATES.**

Under the All Writs Act, courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  In the PFRD, Magistrate Judge Robbenhaar concludes that the All Writs Act grants the Court authority to enter an injunction to prevent the Respondents from removing the Petitioners either from the District of New Mexico or from the United States during the pendency of these habeas proceedings.  See PFRD at 24.  The Respondents object only to the conclusion that the All Writs Act prohibits transfer out of the United States, because enjoining the United States from removing the Petitioners from the United States would be to enjoin otherwise lawful removal on the basis of the underlying habeas petition.  See Objections at 14.

---

[32] There may be a good reason why the Petitioners choose not to ask for immediate relief under § 1226(a) in their TRO filings.  The Petitioners seek to be the named representatives for a class action lawsuit representing, along with a different class regarding aliens detained pending a bond appeal of an IJ's bond hearing ruling to the BIA, a Bond Denial Class -- all noncitizens whom the United States apprehends in the interior of the United States and detains [within the District of New Mexico] who (i) have entered or will enter the United States without inspection; (ii) are not apprehended upon arrival at a port of entry or its functional equivalent, and (iii) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231.  See Class Action Complaint ¶ 56, at 17.  If the Court is to grant the Petitioners relief under § 1226(a) as a result of their TRO filings, the Petitioners status as named representatives in their Class Action complaint could be mooted.  This consideration further supports the Court's refusal to grant relief not requested in the Petitioners' TRO Motion or Amended TRO Motion.

The Court first notes that the recommendation that the Court enjoin the United States from transferring the Petitioners out of the United States during the pendency of the habeas proceedings is beyond the scope of relief that the Petitioners request in the TRO Motion and the Amended TRO Motion. See TRO Motion at 3 (requesting that the Court enjoin the Respondents "from proceeding on removal cases for Mr. Castillo and Mr. Loza and from transferring them out of Otero Processing Center in Chaparral, New Mexico"); Amended TRO Motion at 3 (requesting the same). The Court declines to extend relief beyond the scope of relief requested by the Petitioners. Second, even if the Petitioners request this relief, the Court exercises its discretion under the All Writs Act only to enjoin Petitioners' unlawful removal from New Mexico while their habeas proceedings remain pending. The Court does not prevent, however, the United States from proceeding with the Petitioners' removal proceedings under § 1229(a) during the pendency of these habeas proceedings. The Court will not use the All Writs Act to prevent the United States from using statutory proceedings to obtain a lawful order of removal. Once the Petitioners receive a final order of removal, the United States ceases to detain the Petitioners or put them on bond under § 1226(a), but instead they transfer to § 1231's statutory authority. At that time, the Court loses jurisdiction to hear the habeas petitions for release under § 1226(a), because the habeas petitions will be moot, and, therefore, at that time the All Writs Act is no longer necessary to prevent the Court from losing jurisdiction which it no longer has. The All Writs Act, therefore, is incapable of preventing the United States from carrying out a lawful order of removal on the basis of protecting the Court's jurisdiction, because the Court will lose jurisdiction for this habeas proceeding once the United States obtains a lawful final order of removal. Finally, there is nothing in the record that indicates that removal of either Loza or Castillo outside of the United States is imminent, and therefore the Court concludes that there is no need at the present time and on the present record for the Court to invoke the All Writs Act to prevent this removal from occurring. See A. A. R. P.

v. Trump, 605 U.S. 91, 95 (2025)(applying the All Writs Act to prevent removal of aliens that was imminent to preserve "jurisdiction while the question of what notice is due [before removal] is adjudicated").  The Court, therefore, sustains the Federal Respondents' Objection to Magistrate Judge Robbenhaar's conclusion that, under the All Writs Act's authority, the United States may not remove the Petitioners from the United States during the habeas proceedings' pendency.

## VI.    THE COURT SUSTAINS THE FEDERAL RESPONDENTS' OBJECTION TO THE CHARACTERIZATION OF ITS DISCRETIONARY STAY REQUEST.

The Federal Respondents object to the following language of the PFRD -- "'This lack of immediate urgency was further demonstrated by AUSA Posey's request at the November 19th hearing for DHS to have an opportunity to issue a discretionary stay of removal proceedings'" -- as an inaccurate characterization.   Objections at 14-15 (quoting PFRD at 12).   The Federal Respondents clarify that they are speaking in relation to the automatic stay provision under which the United States previously detains Castillo during the pendency of his BIA appeal, and that their position is that, "should this Court find the automatic stay provision invalid; DHS would request sufficient time to request a discretionary stay from the BIA before any TRO would go into effect." Objections at 15.  To the extent that the Federal Respondents seek a clarification of their statements at the November 19, 2025 hearing to reflect that they do not request an opportunity to issue a discretionary stay of removal proceedings, the Court sustains the Federal Respondents' Objection.

**IT IS ORDERED** that: (i) the Respondents' Objections to the Proposed Findings and Recommended Disposition, filed December 5, 2025 (Doc. 11), are sustained in part and overruled in part; (ii) the Magistrate Judge Proposed Findings and Recommended Disposition, filed November 21, 2025 (Doc. 8), is adopted in part and rejected in part;  (iii) the Petitioners' Motion for Temporary Restraining Order, filed November 3, 2025 (Doc. 3) is granted in part and denied in part; (iv) the Petitioners' Amended Motion for Temporary Restraining Order, filed November 6,

2025 (Doc. 5) is granted in part and denied in part; and (v) the Respondents are enjoined from transferring Petitioners out of the District of New Mexico during the pendency of their habeas proceedings or until the Petitioners receive a final order of removal.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Mary Stillinger
Stillinger & Godinez, PLLC
El Paso, Texas

--and--

Felipe D.J. Millan
Felipe D.J. Millan, P.C.
El Paso, Texas

     *Attorneys for the Petitioners*

Ryan Ellison
  First Assistant United States Attorney
Ryan Posey
Allison Shokes
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for Respondents Kristi Noem, Pamela Bondi, Sirce Owen, Mary De Anda-*
     *Ybarra, Executive Office for Immigration Review, and Otero Immigration Court*

Christina Gooch
Sutin, Thayer & Browne
Albuquerque, New Mexico

     *Attorneys for Respondent Dora Castro*